Geoffrey H. Yost (S.B. #159687)
gyost@omm.com
**O'MELVENY & MYERS LLP**
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone: 415-984-8724

Taylor Simeone (S.B. #327313)
tsimeone@omm.com
**O'MELVENY & MYERS LLP**
400 South Hope Street, 18th Floor
Los Angeles, California 90071-2899
Telephone: 213-430-6000
Facsimile: 213-430-6407

Wendy Wylegala*
wwylegala@supportkind.org
**KIDS IN NEED OF DEFENSE**
252 West 37th Street, Floor 15
New York, NY 10018
Telephone: 646-970-2913

Esther Araya*
earaya@supportkind.org
**KIDS IN NEED OF DEFENSE**
1411 K St. NW, Suite 200
Washington, DC 20005
Telephone: 202-417-1907

*Attorneys for Plaintiffs*
[*Additional counsel listed on signature page*]
[**Pro hac vice applications forthcoming*]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| M.A.N.H., individually and as parent and next friend of his minor child, E.B.N.A., | |
| Plaintiffs, | Case No. 5:23-cv-00372 |
| v. | **COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

1

**INTRODUCTION**

2

1.    This action seeks damages for the inhumane treatment that a father and his

3

then eight-year-old daughter received at the hands of Defendant and its employees.

4

Plaintiffs came to the United States seeking safety and asylum from life-threatening

5

violence in their native country of El Salvador. But instead of offering Plaintiffs an

6

opportunity to seek asylum and initiating that process promptly, employees of the

7

Department of Homeland Security ("DHS") separated this father and young child.

8

Federal employees kept father and daughter apart for over two months. By the time

9

they were allowed to reunite, both had suffered extensive harm.

10

2.    Plaintiff Marcos is 37 years old and the father of Plaintiff Esteffany, who is

11

now 13.[1] Both are citizens of El Salvador, where Marcos worked as a police officer.

12

In El Salvador, MS-13 gang members repeatedly threatened the lives and safety of

13

both Marcos and Esteffany, and they were forced to flee El Salvador in April 2018.

14

They arrived at the United States border in May 2018 to request protection. They

15

did not expect to suffer additional harm at the hands of the United States

16

government.

17

3.    Soon after entering the United States near El Paso, Texas, in May 2018,

18

Marcos and Esteffany spotted a patrol car. They approached the car to identify

19

themselves to the officers and announce their intent to request asylum. United

20

States immigration officers took Marcos and Esteffany into custody and transported

21

them both to a holding facility where they spent the night with other immigrant

22

families in a single, cold room, without bedding and with little to eat or drink. The

23

next day, immigration officers announced that the children would be separated from

24

the adults; they then instructed Esteffany and the other children to say goodbye to

25

26

27

28

---

[1] Plaintiffs have concurrently filed a motion to proceed under pseudonyms because as asylum-seekers, they fear further harm in their country of origin if their identities were publicly disclosed and they subsequently faced removal. "Marcos" refers to M.A.N.H. and "Esteffany" refers to E.B.N.A.

their parents. Marcos was stunned. Esteffany clung to her father and both began to cry. The officers took Esteffany from Marcos without telling him where she would be going or for how long. Marcos feared he would never see his daughter again.

4.      This forcible separation of Marcos and Esteffany occurred under the federal "Zero Tolerance" policy, a name that refers to strict enforcement of laws against unlawful entry into the United States. Its acknowledged purpose, however, was to deter future migrants, including those lawfully seeking asylum, by forcibly separating families. The United States Attorney General announced Zero Tolerance in April 2018, and it was terminated by Executive Order in July 2018. But the forcible separation of family members began before Zero Tolerance was announced and continued for several months after Zero Tolerance was terminated. This conduct will be referred to in this complaint as "Family Separation." The government acknowledges that at least 3,924 children were forcibly separated from their parents, but the true number is likely higher.[2] The separations were carried out without adequate safeguards and for deterrent effect. Family Separation violated existing immigration policies and regulations.

5.      United States government officials have said publicly and repeatedly that they expected Family Separation to be a strong deterrent to Central American families coming to the United States. Officials and employees of multiple federal agencies designed, implemented, and carried out Family Separation in direct contravention of Plaintiffs' constitutional rights, federal agency standards and policies, and a court-ordered settlement agreement; and without adequate plans or procedures for tracking the location of the separated children, for ensuring that separated parents and children could regularly communicate, or for reuniting them.

---

[2] U.S. DEP'T OF HOMELAND SECURITY, FACT SHEET: A REVIEW BY THE FAMILY REUNIFICATION TASK FORCE ON THE SECOND ANNIVERSARY OF ITS ESTABLISHMENT (Feb. 2, 2023), https://www.dhs.gov/news/2023/02/02/fact-sheet-review-family-reunification-task-force-second-anniversary-its [https://perma.cc/G6JX-S65Z].

6.      Following the traumatic separation from her father, Esteffany was placed under the custody of the United States Department of Health and Human Services ("HHS") and flown nearly 2,000 miles to New York, New York. For days, no one told Marcos where his daughter was. HHS placed Esteffany in foster care with a woman she had never met, along with seven other boys and girls who had also been forcibly separated from their parents. Esteffany suffered terribly during this time and cried frequently. She had trusted and depended on her father during the journey from El Salvador, and the separation left her in a strange place with no one to trust. She lost a significant amount of weight after the separation and was often weak from malnourishment and dehydration. In May 2018, Esteffany was hospitalized after collapsing in class. Doctors diagnosed several ailments, including an infection in her right ear that still intermittently impairs her hearing and causes pain. Additionally, a head lice infection went untreated until Esteffany reunited with her father.

7.      Marcos also suffered physically and emotionally from his separation from Esteffany. Throughout his time in detention, Marcos was so worried about his daughter's well-being that he was often unable to eat or sleep. He also cried often, because he felt depressed and anxious, and was desperate to know how his daughter was and when he would see her again. On multiple occasions, Marcos asked the federal officers detaining him about his daughter, but they rebuffed him. The conditions of his detention compounded Marcos's distress. Over the course of two months, he was held in approximately seven different detention facilities in Texas and New Mexico. In some of those facilities, Marcos did not receive enough food, and was not provided access to a shower, basic hygiene products, and a change of clothes. He was also often cold, lacking warm clothing or blankets.

8.      Marcos and Esteffany remained separated for some ten weeks. They spoke by phone only a handful of times during that period. With a case worker monitoring

their calls, Esteffany did not feel she could speak freely to her father. The case worker sometimes ended the call before Esteffany could say goodbye.

9.    Marcos and Esteffany were finally reunited on or around July 22, 2018 in El Paso, Texas. Marcos was devastated to see the changes in Esteffany. Her hair was infested with lice, she was much thinner, and she appeared depressed. This signaled to Marcos that his daughter had been neglected during their time apart. To Esteffany, her father looked thinner and weaker, and his eyes were puffy and red, as if he had been crying. Esteffany had never seen her father like that.

10.    Even after being reunited, Marcos and Esteffany continued to suffer the effects of their separation. Both felt anxious and depressed. It took Esteffany multiple months to tolerate being away from her father without breaking down and sobbing inconsolably. They both suffered from intrusive thoughts, nightmares, flashbacks, and vivid, traumatic memories triggered by smells or sights.

11.    Plaintiffs Marcos and Esteffany bring this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) and §§ 2671–2680 ("FTCA"), seeking compensation for the harms they suffered due to the tortious conduct of employees of the United States, from the officials who formulated Family Separation to the officers and employees who implemented it.

## JURISDICTION & VENUE

12.    This court has subject matter jurisdiction under 28 U.S.C. § 1346(b)(1).

13.    Plaintiffs Marcos and Esteffany have each exhausted their administrative claims. On May 5, 2020, Plaintiffs submitted administrative claims to the Department of Homeland Security, United States Customs and Border Protection ("CBP"), United States Citizenship and Immigration Services ("USCIS"), United States Immigration and Customs Enforcement ("ICE"), and the Department of Health and Human Services. None of those agencies provided a final disposition of those administrative claims over the ensuing six months, nor any response at any

time since. Plaintiffs therefore exercise the option to deem those claims denied pursuant to 28 U.S.C. § 2675(a).

14.     Plaintiffs reside in Rialto, California, which is within the Central District of California. Venue is therefore proper under 28 U.S.C. § 1402(b).

## THE PARTIES

15.     Plaintiff Marcos and his minor daughter Plaintiff Esteffany are citizens of El Salvador. When Defendant's employees forcibly separated the Plaintiffs and detained them 2,000 miles apart for over two months, Marcos was 33 years old and Esteffany was 8 years old. The government forcibly separated Plaintiffs on or about May 9, 2018 and held them apart until on or about July 22, 2018. In addition to individual claims on his own behalf, Marcos acts in a representative capacity as next friend of his minor daughter Esteffany pursuant to Fed. R. Civ. P. 17. Marcos is more than qualified to represent Esteffany's interests in this matter: he is her natural parent; he endured the forcible separation by Defendant's employees together with her; he communicated with Esteffany during their separation; and he has supported her in the process of recovery from the consequences of the separation.

16.     Marcos is a member of the class certified in *Ms. L. v. ICE*, No. 3:18-cv-428-DMS-MDD.[3] In June 2018, the court in *Ms. L.* preliminarily enjoined the detention of adult parents in DHS custody apart from their minor children, absent a determination that the parent is unfit or presents a danger to the child.[4]

17.      Plaintiffs are seeking asylum in the United States. Pursuant to a November 2018 class action settlement agreement in the *Ms. L* litigation, Marcos is awaiting a *de novo* review of a negative credible fear determination that USCIS reached while

---

[3] *See Ms. L. v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 1133, 1139, n.5 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019), *and enforcement granted in part, denied in part sub nom. Ms. L. v. U.S. Immigr. & Customs Enf't*, 415 F. Supp. 3d 980 (S.D. Cal. 2020).
[4] *See id.* at 1149.

he was detained and separated from Esteffany.[5] On December 5, 2022, Plaintiffs were granted a three-year humanitarian status known as "parole in place" under a procedure established by the Interagency Task Force on the Reunification of Families.[6]

18.     Defendant United States of America is the appropriate defendant under the FTCA, 28 U.S.C. §§ 1346(b)(1), 2674, *et seq*. Plaintiffs sue the United States for injuries caused by the wrongful acts or omissions of its employees, including employees of DHS, DHS's constituent agencies CBP and ICE, HHS, and HHS's constituent Office of Refugee Resettlement ("ORR").

19.     DHS employees, officers, and officials are responsible for supervising and managing the detention of noncitizens in CBP and ICE facilities, including those in Texas and New Mexico, where Marcos and Esteffany were initially detained and separated and where Marcos was later transferred. DHS investigative or law enforcement officers were responsible for detaining and separating Marcos and Esteffany, for holding Marcos separately from his child, and for making determinations about referring Marcos to the Department of Justice ("DOJ") for prosecution for unlawful entry.

20.     HHS and ORR employees, officers, and officials are responsible for the care and custody of noncitizen children whom the government classifies as "unaccompanied," including responsibility for their detention, where appropriate.

---

[5] *See* Settlement Agreement at 2–3, *Ms. L. v. U.S. Immigr. and Customs Enf't*, No. 3:18-cv-428-DMS-MDD (S.D. Cal. Sept. 12, 2018) (providing that individuals who had CFIs while separated from a child and received negative credible fear determinations may have their claims re-evaluated); Order at 2, *Ms. L. v. U.S. Immigr. and Customs Enf't*, 3:18-cv-428-DMS-MDD (S.D. Cal. Nov. 15, 2018) (granting final approval of settlement).
[6] *See* U.S. Dep't of Homeland Security, Interim Progress Report, Interagency Task Force on the Reunification of Families 5–6 (Nov. 29, 2021), https://www.dhs.gov/sites/default/files/2021-12/21_1129_s1_interim-progress-report-family-reunification-task-force.pdf [https://perma.cc/5DYT-K27J].

HHS and ORR employees, officers, and officials are responsible for determining placements for unaccompanied children, such as Esteffany's placement in New York following separation from her father, and for overseeing and monitoring the custody of unaccompanied children in contract facilities.

21.     The employees whose acts or omissions harmed Marcos and Esteffany were at all relevant times employees of the government, encompassing senior leadership of federal agencies as well as officers, officials, employees, and others who effectuated the detention and separation of Plaintiffs, working within the scope of their employment. Based on these employees' acts or omissions, the United States, if a private person, would be liable to Plaintiffs, 28 U.S.C. § 1346(b)(1).

**FACTUAL ALLEGATIONS**

**A.      The Right to Seek Asylum and Other Protection from Persecution**

22.     Seeking asylum—protection from a fear of persecution on account of a protected ground—is a right enshrined in United States statutes that implement international agreements and reflect widely accepted principles of international law. Unauthorized entry into the United States does not defeat the right to seek asylum. To the contrary, 8 U.S.C. § 1158(a)(1) provides that "[a]ny [noncitizen][7] who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival . . .* ), irrespective of such [noncitizen's] status, may apply for asylum" (emphasis added). Moreover, the law forbids removing a person to a country where their life or freedom would be threatened on account of a protected ground.

---

[7] A 2021 policy memorandum of the Executive Office for Immigration Review (the Department of Justice component that adjudicates immigration proceedings) notes that recent Executive Orders and Supreme Court decisions avoid the term "alien," and directs agency employees to do the same except in quoting legal authority. EXEC. OFF. FOR IMMIGR. REV., PM 21-27, TERMINOLOGY 1–2 (Jul. 26, 2021), https://www.justice.gov/eoir/book/file/1415216/download [https://perma.cc/CZ6T-XWVX]. This Complaint avoids using the term "alien."

23.     Certain migrants apprehended and found to be inadmissible may be subject to "expedited removal" processing. In that context, if an individual expresses an intention to seek asylum or a fear of persecution, an asylum officer will conduct an interview to determine whether the individual has a credible fear of persecution. If the officer determines that the individual has a credible fear of persecution, the person will be referred for further proceedings before an immigration judge, and the asylum-seeker may be released from government custody.

**B.      Enforcement of Statutes Prohibiting Unlawful Entry**

24.     Under 8 U.S.C. § 1325(a), a noncitizen may be subject to criminal prosecution for "improper entry" if he or she "enters or attempts to enter the United States at any time or place other than as designated by immigration officers." Although immigration law is primarily civil law, such "improper entry" is a misdemeanor punishable under Title 18 of the United States Code, Crimes and Criminal Procedure. For a first offense, the penalty may include a fine, imprisonment for not more than six months, or both.

25.     Before Zero Tolerance, when DHS officials referred adults to the DOJ for criminal prosecution based on unlawful entry, it was commonplace for the charge to be disposed of with a single court appearance and a sentence of time served, and for the individual to be returned to DHS custody, often the same day.

**C.      Standards Governing Apprehension and Detention of Noncitizen Children and Adults**

26.     In 1997, the government entered into a court-approved settlement of litigation challenging the standards and conditions of children's immigration detention.[8] The *Flores* Settlement requires that the United States government "treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Further, it requires

---

[8] *See* Stipulated Settlement Agreement, *Flores v. Reno*, No. CV 85-4544 (C.D. Cal. Jan. 17, 1997) ("*Flores*" or "*Flores* Settlement").

the United States government to "hold minors in facilities that are safe and
sanitary" and to provide "access to toilets and sinks, drinking water and food . . . ,
medical assistance . . . , adequate temperature control and ventilation, adequate
supervision . . . , and contact with family members who were arrested with the
minor."

27.   Under 8 U.S.C. § 1232(b)(1), the care and custody of all unaccompanied
children is the responsibility of the Secretary of HHS. More specifically, under 6
U.S.C. § 279(b)(1), Congress conferred a host of responsibilities on the Director of
ORR, including "coordinating and implementing the care and placement of
unaccompanied [noncitizen] children;" "ensuring that the interests of the child are
considered in decisions and actions relating to the[ir] care and custody[;]" making
and implementing placement determinations for all unaccompanied children;
"identifying a sufficient number of qualified individuals, entities, and facilities to
house unaccompanied [noncitizen] children;" and "overseeing the infrastructure
and personnel" of such facilities.

28.   ORR's Unaccompanied Children Program Policy Guide ("Policy Guide")
reflects ORR's statutory obligation to place a "child in the least restrictive setting
that is in the best interests of the child."[9] Further, the Policy Guide incorporates
provisions of the *Flores* Settlement as "minimum services" that licensed care
providers are required to provide. The Policy Guide specifies that
"[u]naccompanied alien children must be provided the opportunity to make a
minimum of two telephone calls per week (10 minutes each) to family members
and/or sponsors, in a private setting."

---

[9] OFF. OF REFUGEE RESETTLEMENT, *ORR Unaccompanied Children Program Policy Guide: Section 1* § 1.2.1 (Oct. 31, 2022), https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide [https://perma.cc/32EJ-9JQQ]; 8 U.S.C. § 1232(c)(2)(A).

29.     In October 2015, CBP published nationwide standards governing agency interaction with detained individuals.[10] The TEDS Standards reflect legal and regulatory requirements as well as CBP policies and best practices. They set forth standards on safety, the condition of facilities, and providing for detainees' needs.

30.     The TEDS Standards state that food must be provided to all adult detainees "in edible condition" and "at regularly scheduled meal times[;]" adult detainees must also "be provided with snacks between regularly scheduled meal times." Further, "[f]ood and water should never be used as a reward, or withheld as punishment." All child detainees must "be offered a snack upon arrival and a meal at least every six hours thereafter, at regularly scheduled meal times" and "[a]t least two of those meals will be hot." All child detainees must also "have regular access to snacks, milk, and juice." Finally, "[f]unctioning drinking fountains or clean drinking water along with clean drinking cups must always be available to detainees."

31.     Under the TEDS Standards, "[d]etainees must be provided with basic personal hygiene items" and "[a]ll facilities or hold rooms used to hold detainees must be regularly and professionally cleaned and sanitized." CBP personnel must also provide "[c]lean bedding" to all children and "clean blankets" to all adults upon request. Furthermore, "[w]hen it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents. Under no circumstances will officers/agents use temperature controls in a punitive manner."

32.     Importantly, the TEDS Standards also recognize "family units" as an at-risk population "who may require additional care or oversight." In particular, CBP

---

[10] U.S. CUSTOMS AND BORDER PROT., NATIONAL STANDARDS ON TRANSPORT, ESCORT, DETENTION, AND SEARCH 3 (Oct. 2015), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf [https://perma.cc/7A68-MX6M] [hereinafter "TEDS STANDARDS"].

commits to "maintain[ing] family unity to the greatest extent operationally feasible, absent a legal requirement or articulable safety or security concern." The TEDS Standards reiterate that "[g]enerally, family units with juveniles should not be separated[,]" and where separation is necessary "due to different immigration dispositions, such separation must be documented in the appropriate electronic system(s) of record." CBP officers are not permitted to hold "[d]etainees under the age of 18 years . . . with adult detainees, unless the adult is an immediate relative or legal guardian responsible for the care and custody of the juvenile, and no other adult detainees are present in the area." The only exceptions to this standard are those "made on a case-by-case basis, based on family unity."

33.     In 2011, ICE published nationwide standards governing conditions of immigration detention.[11] The last revision to the PBNDS prior to Family Separation was published in 2016. The PBNDS reflect "federal legal and regulatory requirements as well as prior ICE policies and policy statements."[12] They set forth standards on safety, the condition of facilities, and providing for food, water, medical, legal, and other needs.

34.     In the PBNDS, ICE acknowledges that it "exercises significant authority" when detaining migrants and therefore "must do so in the most humane manner possible with a focus on providing sound conditions and care." The PBNDS lists ICE's duties to provide detainees "nutritionally balanced diets[,]" "[s]afe, potable water," "clean clothing, bedding, towels, and personal hygiene items[,]" among other necessities.

---

[11] U.S. IMMIGR. & CUSTOMS ENF'T, PERFORMANCE-BASED NATIONAL DETENTION STANDARDS 2011 (rev. Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf [https://perma.cc/WLN4-N8WW] [hereinafter "PBNDS"].

[12] U.S. IMMIGR. & CUSTOMS ENF'T, *2011 Operations Manual ICE Performance-Based National Detention Standards*, https://www.ice.gov/detain/detention-management/2011 [https://perma.cc/6E43-RGR5].

35.     The Supreme Court has consistently recognized the fundamental right to family integrity.[13] The Court has stated: "We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'"[14]

36.     The United States government owes a duty of care to the migrant families and individuals in its custody. The leadership of CBP, ICE, and ORR have affirmed these duties in their agency policies, including but not limited to the authorities described above. These policies also reflect the special relationship between each of these agencies and the migrants in their custody. Through Family Separation, the United States failed in these mandatory duties and obligations.

**D.      Implementation of Family Separation**

37.     In 2016, a DHS Advisory Committee—formed to provide advice and recommendations about ICE's family residential centers in response to controversy over family detention policies—concluded that "the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children" and that "[f]amily separation in these circumstances raises serious concerns and violates the best interests of the child—which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members."[15]

---

[13] *See Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 231–33 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399–401 (1923)).
[14] *Quilloin*, 434 U.S. at 255 (quoting *Smith v. Organization of Foster Families*, 431 U.S. 816, 862–863 (1977) (Stewart, J., concurring in judgment)).
[15] U.S. IMMIGR. & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REPORT OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS 1–2, 10 (Sept. 30, 2016), https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf [https://perma.cc/TZ9C-CUMC].

38.     Notwithstanding those findings, by February 2017, United States employees within the Trump Administration were planning to separate families arriving at the southern border and seeking to enter the United States. These employees intended that the prospect of being separated would discourage individuals, including asylum-seekers, from coming to the United States. A February 16, 2017 email from an HHS employee to a White House official acknowledges this objective of deterrence: "DHS proposes separating children in family units from their parents and referring them to ORR as Unaccompanied Alien Children (UACs) . . . as a deterrent to families who have not yet entered the U.S."[16]

39.     The contemplated family separations contravened DHS's own 2016 Advisory Committee report and represented a sharp departure from longstanding domestic and international law principles in favor of family unity.

40.     Contemporaneously, warnings about foreseeable impacts of Family Separation came from within the government and the private sector. As early as February 2017, Jonathan White, ORR's Deputy Director for Children's Programs— a senior career employee responsible for managing ORR's care and custody of unaccompanied children—repeatedly raised concerns about both child welfare consequences of family separation, and the operational and capacity implications for the ORR UC program.[17] Tricia Swartz, Associate Deputy Director for ORR, observed that, as of March 2017, children traveling to the United States with their parents "tend to skew heavily toward tender aged children" who "require[]

---

[16] Plaintiffs' Reply In Support of Motion To Compel Review of Documents In Camera at Ex. 1, *C.M. et al v. United States*, 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), https://storage.courtlistener.com/recap/gov.uscourts.azd.1203642/gov.uscourts.azd.1203642.210.2.pdf.

[17] *See* Caitlin Dickerson, *The Secret History of Family Separation*, THE ATLANTIC (Aug. 7, 2022) at 23. Dickerson provided her primary source for this statement here: https://www.documentcloud.org/documents/23557046-list-of-attempts-by-white-to-inquire-and-raise-red-flags-about-plans-to-separate-families [https://perma.cc/24TC-DZ8E].

- 14 -

specialized care," requiring the UC program to address "a variety of particular needs . . . such as weaning and traumatization of separation."[18] Swartz also anticipated that complications in discharging separated children would result in longer stays in government custody. Further, she observed that the "separation of children from their families could be considered a human rights abuse" and "could increase the risk of human trafficking."

41.     In a March 2017 public statement reacting to media reports of a proposal to separate mothers and children at the border, the American Academy of Pediatrics warned of the damage to "vulnerable, scared children" and urged federal authorities to "exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers."[19]

42.     In spite of such foreseeable issues, the federal agencies proceeded to implement family separation in the form of a pilot program based in the Border Patrol's El Paso Sector from approximately July to November of 2017 (the "Pilot Program"). In 2021, a report of the DOJ Inspector General's ("DOJ IG") Office would determine that "DOJ officials . . . did not attempt to inform themselves, prior to implementation of the zero tolerance policy, about the problems that arose" during the Pilot Program, including with regard to ORR capacity to accommodate separated children.

---

[18] Plaintiffs' Reply In Support of Motion To Compel Review of Documents In Camera at Ex. 18, *C.M. et al v. United States*, 2:19-cv-05217-SRB (D. Ariz. June 7, 2022), https://storage.courtlistener.com/recap/gov.uscourts.azd.1203642/gov. uscourts.azd.1203642.210.2.pdf.

[19] Fernando Stein & Karen Remley, *AAP Statement Opposing Separation of Mothers and Children at the Border*, AMERICAN ACADEMY OF PEDIATRICS (Mar. 4, 2017), https://www.aap.org/en/news-room/news-releases/pediatrics2/2017/ immigrantmotherschildrenseparationv/ [https://perma.cc/AZ5Q-TN38].

2. *The United States Implements the "Zero-Tolerance Policy"*

43.     On April 6, 2018, then Attorney General ("A.G.") Jeff Sessions announced Zero Tolerance, directing U.S. Attorney's Offices on the southwest border "to prosecute all Department of Homeland Security referrals of section 1325(a) violations, to the extent practicable."[20] On April 23, 2018, Kirstjen Nielsen, the Secretary of DHS at the time, authorized a DHS policy of seeking unlawful entry "prosecution of all amenable adults . . . including those presenting with a family unit."[21]

44.     In public remarks on Zero Tolerance on May 7, 2018, A.G. Sessions stated, "If you are smuggling a child, then we will prosecute you and that child will be separated from you *as required by law*."[22] Multiple DOJ leaders would later confirm that Sessions understood that expanding prosecutions for unlawful entry to all adults, including those in family units, would result in family separations. Separating families was *not* required by any statute or regulation.

45.     In 2021, the DOJ Inspector General found that "Department leadership and, in particular, the Office of the Attorney General (OAG), which had primary responsibility for the policy's development, failed to effectively prepare for, or

---

[20] *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry*, DEP'T OF JUSTICE (Apr. 6, 2018), www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-criminal-illegal-entry [https://perma.cc/9ZJB-BR37].

[21] *Increasing Prosecutions of Immigration Violations*, DEP'T OF HOMELAND SECURITY (Apr. 23, 2018), https://s3.documentcloud.org/documents/4936568/FOIA-9-23-Family-Separation-Memo.pdf [https://perma.cc/KT6A-A2DQ].

[22] *Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration*, DEP'T OF JUSTICE (May 7, 2018) (emphasis added), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions [https://perma.cc/HT7G-MXXU].

manage, the implementation of the zero tolerance policy."[23] In particular, "the Department's single-minded focus on increasing prosecutions came at the expense of careful and appropriate consideration of the impact that prosecution of family unit adults and family separations would have on children traveling with them and the government's ability to later reunite the children with their parents." Further, the DOJ IG found "no evidence that DOJ leadership engaged in discussions . . . about a process for expediting prosecutions of family unit adults so that child separations would not occur." After reviewing the DOJ IG's report, former Deputy Attorney General Rod Rosenstein admitted that "[t]he government was not prepared to deal with [family separations]," and that prosecution of adults in family units "should not have been implemented."

46.    DOJ leadership did not provide effective coordination within and among federal agencies implementing Family Separation. DOJ leadership did not inform the relevant U.S. Attorneys' Offices, the U.S. Marshals Service ("U.S. Marshals"), HHS, or even the Office of the Deputy Attorney General about the implementation of Zero Tolerance prior to Sessions' announcement of it on April 6, 2018. Senior HHS officials noted that they first learned about the implementation of Family Separation when the media reported it. That lack of coordination hindered—among other efforts—ORR's ability to plan for family separations, leading to insufficient bed capacity for separated children, care provider facilities struggling to meet children's needs, and difficulty identifying separated children for reunification.

---

[23] DEP'T OF JUST. OFF. OF THE INSPECTOR GEN., REVIEW OF THE DEPARTMENT OF JUSTICE'S PLANNING AND IMPLEMENTATION OF ITS ZERO TOLERANCE POLICY AND ITS COORDINATION WITH THE DEPARTMENTS OF HOMELAND SECURITY AND HEALTH AND HUMAN SERVICES i (Jan. 14, 2021), https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf [https://perma.cc/J8ND-REPE] [hereinafter 2021 DOJ IG REPORT].

47.     DOJ leadership were or should have been aware of numerous operational challenges prior to implementing Family Separation, but did not alter Family Separation to address them.

48.     Similarly, DHS leadership knew or should have known from its experience with the Pilot Program that it did not have a system capable of accurately tracking separated families. Prior to April 2018, DHS and HHS data systems did not systematically collect and maintain information to indicate when a child was separated from his or her parents. When DHS employees adopted ad hoc techniques to work around technical limitations, those techniques actually "introduced data errors that further hindered [ICE] officers' ability to track migrant parents separated from their children."[24] Prior to July 2018, tracking of separated children by ORR staff was not comprehensive, not formalized in procedures, and relied on informal tools such as an Excel spreadsheet and later a SharePoint database. In addition, as the HHS Office of the Inspector General ("HHS IG") found in a 2020 report, "HHS and DHS did not routinely . . . share the information necessary to identify, track, or connect families separated by DHS."[25] As such, it concluded that "[p]oor interagency communication and internal management decisions that failed to protect children's interests left HHS unprepared for the zero-tolerance policy," and that the "lack of preparation impeded HHS's ability to identify, care for, and reunify separated children." During Family Separation, U.S. Attorney's Offices "struggled to provide information about separated families in response to judicial inquiries and were frustrated in their efforts to gather additional information from DOJ headquarters, DHS, and HHS about the separation and reunification

---

[24] *Id.* at 33 (quoting a report from the DHS Inspector General).
[25] DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE OF INSPECTOR GENERAL, COMMUNICATION AND MANAGEMENT CHALLENGES IMPEDED HHS'S RESPONSE TO THE ZERO-TOLERANCE POLICY 6 (Mar. 2020), https://oig.hhs.gov/oei/reports/oei-BL-18-00510.pdf [https://perma.cc/7NRD-ER8C] [hereinafter HHS IG REPORT].

process."[26] Meanwhile, judges and defense attorneys continued to raise concerns about the separation and tracking of children. At a federal judges' conference, for example, DOJ officials fielded "heavy criticism from both Article III and Magistrate Judges for how the [government] has been handling issues related to children."[27] As anticipated in multiple early warnings about Family Separation, the effects on families were traumatic. Separated children exhibited fear, post-traumatic stress, anxiety, and feelings of loss and abandonment; some "expressed acute grief that caused them to cry inconsolably."[28] The HHS Office of the Inspector General found that "facilities struggled to address the mental health needs of children who had experienced intense trauma, including separated children, and had difficulty accessing specialized treatment for children who needed it."[29] In short, "HHS's inadequate communication, management, and planning made the situation worse for many separated children."[30]

49.     Because DOJ leadership did not include representatives from the U.S. Marshals in planning Family Separation prior to implementing it, U.S. Marshals faced issues including insufficient bed space and medical care for detainees.

50.     Moreover, even though ORR policy required case managers to coordinate biweekly phone calls between children in ORR custody and their family members, employees with the U.S. Marshals often failed to facilitate those communications, which delayed establishing contact between separated family members. Some U.S. Marshals managers were even completely unfamiliar with ORR and had to research it on the internet. U.S. Marshals staff shortages and parents' inability to pay telephone charges also contributed to delays in connecting separated family members. In at least one district, the lack of guidance within U.S. Marshals

---

[26] 2021 DOJ IG REPORT at 43–44.
[27] *Id.* at 47.
[28] 2020 HHS IG REPORT at 22.
[29] *Id.* at 9.
[30] *Id.* at 39.

1   "resulted in delays of 1 to 8 weeks before separated children and parents in custody
2   could establish contact."[31]

3   51.     DHS informed DOJ leadership that Family Separation was taxing its
4   resources. CBP facilities were holding separated children for "long periods in
5   facilities intended solely for short-term detention."[32] For example, on June 2, 2018,
6   the DHS Deputy Secretary specifically informed DOJ leadership that "CBP had
7   109 UACs [in custody] over 72 hours (in violation of a requirement of the *Flores*
8   settlement agreement) and [was] experiencing significant slowdowns in placement
9   of UACs which will only exacerbate that issue."[33] She added, "If we cannot turn
10  this around and timely place UACs, we will have no choice but to scale back on
11  [the zero tolerance policy] and undermine the deterrent effect we are looking to
12  achieve."

13  3.      *The President Orders an End to Family Separation*
14  52.     Only after Family Separation garnered widespread condemnation did then-
15  President Trump sign an executive order on June 20, 2018 announcing an end to
16  Zero Tolerance. The executive order stated that it was the "policy of this
17  Administration to maintain family unity, including by detaining alien families
18  together where appropriate and consistent with law and available resources." The
19  executive order, however, did not explain whether or how the federal government
20  would *reunify* children who had been separated from their parents. In fact, on June
21  22, 2018, the government admitted that it had no reunification procedure in place.

22
23

24  [31] 2021 DOJ IG REPORT at 65.
25  [32] DEPARTMENT OF HOMELAND SECURITY OFFICE OF INSPECTOR GENERAL, SPECIAL
26  REVIEW - INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER
    THE ZERO TOLERANCE POLICY 4 (Sept. 27, 2018), https://www.oversight.gov/sites/
27  default/files/oig-reports/OIG-18-84-Sep18.pdf [https://perma.cc/C45M-HELW]
    [hereinafter OIG-18-84 SPECIAL REVIEW].
28  [33] 2021 DOJ IG REPORT at 54.

Worse, even after the executive order, officials forcibly separated thousands more children from their parents.

53.     It was not until June 26, 2018, when a federal judge in *Ms. L. v. U.S. Immigration and Customs Enforcement* ordered the government to reunify families, that the United States government finally began taking steps to do so.

4.     *The Government's Failure to Track Separated Families Led to Delays in Reunification*

54.     The agencies involved in separating families had failed to collect complete, reliable, and consistent data that would permit prompt and safe reunification. HHS officials and employees struggled to physically reunite families, resulting in "children having to wait for parents for unreasonably long amounts of time and parents transported to the wrong facilities."[34]

55.     Though DHS claimed in June 2018 that it had a "centralized database" of separated families, no such database was located and ICE employees tasked with reunification had not heard of such a database.

56.     Absent a centralized database with reliable information, agencies resorted to a variety of inefficient and ineffective methods to attempt to reunify families. These methods included officers hand-sifting through data looking for any indication that a child in HHS custody had been separated from his or her parent, writing separation information in non-searchable text fields that could only be accessed by manually reviewing individual files, and seeking help from an interagency data team led by the Office of the Assistant Secretary for Preparedness and Response, an HHS agency whose normal purview involves hurricanes and other disasters. Some care provider facility staff found it most effective—albeit time-consuming—to call individual adult detention facilities to ask whether they had custody of a particular

---

[34] UNITED STATES GOV'T ACCOUNTABILITY OFF., AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE BORDER 29 (Oct. 2018), https://www.gao.gov/assets/gao-19-163.pdf [https://perma.cc/4G2V-TDYG].

parent, but the detention facilities sometimes did not answer calls. On average, it took weeks to simply locate a parent, then additional days to arrange a phone call, a necessary first step toward reunification. Longer stays at care provider facilities resulted in deteriorating mental health for some children.

57.     Judge Sabraw, the federal judge presiding over *Ms. L*, noted:

> The government readily keeps track of personal property of detainees in criminal and immigration proceedings. Money, important documents, and automobiles, to name a few, are routinely catalogued, stored, tracked, and produced upon a detainee's release, at all levels— state and federal, citizen and alien. Yet, the government has no system in place to keep track of, provide effective communication with, and promptly produce alien children. The unfortunate reality is that under the present system migrant children are not accounted for with the same efficiency and accuracy as *property*. Certainly, that cannot satisfy the requirements of due process.[35]

**E.     Plaintiffs Suffer Under Family Separation**

1.     *Plaintiffs Sought Asylum in the United States*

58.     Marcos and Esteffany fled El Salvador after Marcos received death threats from MS-13 gang members. MS-13 had targeted Marcos and his family because Marcos was a police officer. In October 2017, Marcos wounded an MS-13 gang member in self-defense. The gang began watching Marcos and threatening him. They threatened to kill his family and made clear that they knew where the family lived and where Esteffany attended school. Marcos filed a police report but having worked in Salvadoran law enforcement for over a decade, he knew that the threats would not be seriously investigated, and that he and his family were not safe in El Salvador.

59.     Fearing for their lives, Marcos and Esteffany came to the United States to seek asylum.

---

[35] *Ms. L.*, 310 F. Supp. 3d at 1144 (emphasis in original).

2.    *The Forced Separation of Marcos and Esteffany*

60.    Marcos did not know the procedures for applying for asylum. He believed that United States immigration officials would explain it to him once he and Esteffany safely reached the United States. On May 8, 2018, after traveling for approximately ten days, Marcos and his daughter crossed the United States border near El Paso, Texas.

61.    Shortly after crossing, Marcos spotted a law enforcement vehicle and approached the officers, believing this would be the first step in securing safety for him and his daughter in the United States. Marcos identified himself to the Border Patrol officer and stated that he intended to seek asylum. The officer told Marcos that the rules had changed and that he would be going to jail and his daughter would be taken from him. Though he had no authority to say so, the officer told Marcos that the United States was not granting asylum to anyone anymore.

62.    The officers drove Marcos and Esteffany to a nearby Border Patrol Station— on information and belief, the Paso del Norte Station in El Paso, Texas. There, CBP officers confiscated all of Marcos's and Esteffany's belongings, including their money, passports, Marcos's phone, and whatever clothes they were not then wearing. Other than their money, these items were never returned to them. Marcos and Esteffany were led to a small room with approximately ten other families who had young children.

63.    Marcos and Esteffany were held in this room for about twenty hours. During this time, CBP officers gave them no opportunity to brush their teeth, shower, or change their clothes. Both were extremely hungry. They were both cold, with nowhere to sleep except on the concrete floor or a bench. CBP officers gave them no pillows or blankets. Esteffany, frightened and cold, found it difficult to sleep with the constant sound of other children crying.

64.    The next day, May 9, 2018, Esteffany was left in the room while a CBP officer took Marcos to another room where he was shown a video in Spanish. He

recalls that the video explained that the children would be taken to a shelter, where they would be taken care of and attend school until being reunited with their parents or another relative. From this Marcos understood that Esteffany would be taken from him. He was devastated.

65.    A few hours later, a CBP officer entered the room and told the children to say goodbye to their parents. Esteffany began to cry. She hugged her dad and told him that she loved him. Hugging and kissing his daughter, Marcos told her, through his tears, that she was going to be okay. The CBP officer then took Esteffany away.

66.    CBP officers refused to tell Marcos how long he would be separated from his eight-year-old daughter or where she was being taken. Marcos could think of nothing else: What will happen to her? What if she gets sick? Who will comfort her in a strange place? What will they tell her when she asks about me? His greatest fear—and hers—was: what if we never see each other again?

67.    Although federal officials justified Zero Tolerance on the basis that it would allow for the prosecution of all adults crossing the border unlawfully, on information and belief, the United States never prosecuted Marcos. Thus, even the ostensible justification for the policy had no bearing in separating Marcos from Esteffany.

3.    *The Mistreatment of Marcos in Immigration Detention*

68.    For over two months, from May 9, 2018, until approximately July 22, 2018, the United States held Marcos in a series of approximately seven facilities in Texas and New Mexico. Law enforcement officers moved Marcos between facilities without telling him where he was going, why, or for how long.

69.    After the separation, officers handcuffed Marcos and transported him by car to, on information and belief, Santa Teresa, New Mexico, where he remained for approximately three days. There, he was placed in a small, windowless room with a number of other men. The room was bare and cold, with a concrete floor and no furniture. Marcos had to sleep on the floor without a blanket or pillow. Once again,

the CBP officers gave him no opportunity to shower, brush his teeth, change his clothes, or go outside. Anxious about his daughter's well-being, he had no appetite for food or drink, and began to suffer from dehydration.

70.     Several officers misled Marcos about his legal right to seek asylum. CBP officers repeatedly told him that the United States was no longer offering asylum and that Marcos was not eligible anyway. This misleading information induced Marcos to sign several documents purporting to waive many of his legal rights, including a purported waiver of his right to a hearing before an immigration judge and a consent to being removed to El Salvador.

71.     On or around May 12, 2018, DHS transported Marcos to another detention facility in, on information and belief, El Paso, Texas. He remained there for approximately one or two days. DHS again held Marcos in a small, cold room with several other men. He experienced conditions there that were similar to the prior facility. Marcos had to sleep on the concrete floor without a blanket or pillow and DHS officers gave him no opportunity to shower, brush his teeth, or change his clothes.

72.     On information and belief, DHS next transported Marcos by bus to the West Detention Facility in Sierra Blanca, Texas. Officers locked Marcos in a cell-like room with approximately eighty other men. He now had a bunk and was able to shower, brush his teeth, and change clothes, but he was still denied any news of his daughter and not permitted to contact her. After approximately a week, an officer gave Marcos a phone number and the name of someone who was with Esteffany. He called the number, spoke with Esteffany's ORR case manager, and learned for the first time that Esteffany was thousands of miles away in New York. When Marcos asked to speak with his daughter, he was told that Esteffany was unavailable.

73.     During his time in Sierra Blanca, Marcos learned from another detainee that he could request a "credible fear interview." He requested the interview, but no one told him when it would be scheduled or what was involved.

74.     At some point during his detention, DHS transported Marcos and other detainees to a courthouse where he waited for a time before DHS took Marcos and the other detainees back to their detention facility without having seen a judge. According to DHS records, prosecution of Marcos was declined due to time constraints.

75.     After approximately two weeks in Sierra Blanca, ICE transported Marcos to, on information and belief, a detention facility in El Paso, Texas, where he remained for approximately one or two days. Similar to his prior detention in El Paso and Santa Teresa, Marcos was again placed in a small, cold room with several other men. CBP officers gave Marcos food and drink but no opportunity to shower, brush his teeth, or change his clothes. At night, Marcos was forced to sleep on the concrete floor without a blanket or pillow.

76.     On or around May 26, 2018, ICE transported Marcos by bus to the Cibola County Correctional Center in Milan, New Mexico. Officers handcuffed Marcos's wrists to his waist and cuffed his feet for the duration of the half-day journey except for one stop for food and to use the restroom. At Cibola, officers placed Marcos in a room with about twenty other men.

77.     On May 31, 2018, without giving him any time to prepare or the opportunity to seek legal advice, a USCIS asylum officer conducted Marcos' credible fear interview. Marcos tried to explain to the immigration officer the reasons that he had fled El Salvador.

78.     On June 7, 2018, the asylum officer issued a decision finding Marcos's testimony credible, yet finding that Marcos would be unable to establish that his fear of persecution was on account of any of the protected grounds, as required to be granted asylum. A USCIS asylum officer informed Marcos of the results of his

interview and that he could appeal the decision to an immigration judge or agree to be deported. The USCIS asylum officer also told Marcos that if he chose the latter, he would be reunified with his daughter. Demoralized and believing the numerous previous claims by CBP officers that the United States was no longer granting asylum, Marcos declined to appeal the decision. Despite his fear of persecution in El Salvador, he was overwhelmed by his continued separation from his daughter and desperately wanted to be reunited with her.

79.     In November 2018, as a result of a settlement agreement in the *Ms. L* litigation, post-separation credible fear interviews—like the one given to Marcos— were determined to be invalid because of the severe distress that parents suffered while being separated from their children.[36]

80.     Marcos was detained in New Mexico for around 53 days. While the conditions of his detention were often poor, Marcos's separation from Esteffany caused him the greatest distress. Often unable to eat or sleep, he lost weight, often felt weak, and did not speak much with other detainees. He felt depressed, anxious, angry, and desperate. On the rare occasions when he did speak with Esteffany, hearing her cry made him feel worse. He blamed himself. To this day, he cannot help but cry when he thinks about what Esteffany went through.

4.     *The Mistreatment of Esteffany in Immigration Detention*

81.     After separating Esteffany from her father on May 9, 2018, CBP officers put her and other separated children on a bus. The other children appeared to be as young as Esteffany or younger. The bus had bars on its windows and was sectioned into cells. Its windows were tinted so the children could not see out. When Esteffany and the other children began to cry, no one comforted them. Instead, the

---

[36] *See* Settlement Agreement at 2–3, *Ms. L. v. U.S. Immigr. and Customs Enf't*, No. 3:18-cv-428-DMS-MDD (S.D. Cal. Sept. 12, 2018); Order at 2, *Ms. L. v. U.S. Immigr. and Customs Enf't*, 3:18-cv-428-DMS-MDD (S.D. Cal. Nov. 15, 2018) (granting final approval of settlement).

officer driving the bus shouted at the children, telling them that if they kept crying, they would never see their parents again.

82.     After a few hours of travel, Esteffany and the other children arrived at another detention facility. Federal officers put Esteffany in a cold, jail-like room with a few other girls where she stayed for approximately three days. Esteffany slept on a bed that folded down from the wall with a blanket but no pillow. She was given food once per day. She was not given the opportunity to shower, brush her teeth, or change clothes. She did have access to a bathroom, but there was no soap or toilet paper and it was not private. The children were rarely checked on except to slide their food through a slot in the door.

5.      *Esteffany Was Taken to an ORR Shelter for Unaccompanied Minors*

83.     On or around May 11, 2018, adults who Esteffany believes were CBP officers took her in a car with a different group of children to an airport. It was her first time at an airport and Esteffany had never been on a plane. Esteffany was scared, hungry, and crying. The officers put her on a plane that was filled with other children. They told Esteffany that she would see her father again if she followed their instructions.

84.     While under United States custody, Esteffany was flown more than 2,000 miles to New York City. Once there, federal employees transferred her into the custody of HHS and the care of Cayuga Centers, an organization that places children in foster homes (sometimes with multiple other unaccompanied minors in the same home) and provides all-day programming for those children.

85.     According to ORR data, Cayuga Centers housed the largest number of separated children in custody as of June 26, 2018. But Cayuga Centers was unprepared to handle this volume of separated children, and, according to a Cayuga Centers employee, it had an insufficient number of case managers, medical staff, and teachers for its growing population. Indeed, after a tour of the facility in June 2018, the New York Daily News reported that former New York City Mayor

Bill de Blasio said, "The folks at the Cayuga Centers . . . didn't expect this influx. They don't have enough health professionals on site."[37]

86.     Esteffany was assigned to live with a woman in her apartment in New York City. In the three-bedroom apartment, one room housed the woman, another housed Esteffany and three other girls, and a third housed four boys. Esteffany came to learn from the other children that they had also been separated from their parents. Esteffany was provided with a bed and she shared clothes and shoes with the other girls in her room. Her foster parent would sometimes leave the apartment to run errands. At least once, Esteffany's foster parent arranged for her boyfriend to watch Esteffany and the other children when she was out of the house. This made Esteffany uncomfortable.

87.     Every morning, all the children took a train ride of approximately 30 minutes to Cayuga Centers. The center provided lunch but Esteffany didn't eat much as she lost her appetite and the food was often unappetizing.

88.     During her stay in New York, Esteffany suffered severe emotional and physical distress, including being hospitalized for several days due to illness. Esteffany stated that throughout it all she felt that no one seemed to be worried about her. No one asked how she was doing or expressed concern for her. The only exception was her time in the hospital, where Esteffany recalls the doctors were kind to her and took care of her. A few days after arriving in the United States, Esteffany felt her head begin to itch. It continued to itch for the rest of her time in United States custody. Esteffany had contracted head lice, but, according to Esteffany, none of Defendant's employees ever acknowledged the infestation or took steps to treat it. Esteffany observed that many other children around her seemed to suffer from head lice as they were frequently scratching their heads.

---

[37] Nicole Hensley, *Leaked video from Cayuga Centers in Manhattan shows migrant girl weeping for mother*, NY DAILY NEWS (Jun. 26, 2018), https://www.nydailynews.com/new-york/manhattan/ny-metro-cayuga-centers-leaked-video-girl-crying-20180626-story.html [https://perma.cc/FT74-5CMU].

89.     Being separated from her father was devastating for Esteffany. She was sad every day. Esteffany recalls going to the bathroom in the middle of the night to cry in silence. She lost her appetite. She often felt dizzy and weak. At times, she could barely sit up or stand. She was dehydrated and malnourished. She lost weight.

90.     Around May 25, 2018, Esteffany felt ill with severe throat pain. She had been unable to eat and appeared dehydrated. She collapsed in class. Esteffany had a fever, bumps on her tongue, and an ear infection. Esteffany was admitted to Harlem Hospital in Manhattan, where she was diagnosed with coxsackie virus, Scarlet fever, conjunctivitis, and an ear infection. She remained there for several days. Esteffany remembers her foster parent visiting her only once. Her ear infection was painful, and she temporarily lost hearing in that ear. Esteffany does not recall going to the doctor again after she was released from the hospital, and it took several weeks for her ear to feel better. Even now, years later, Esteffany's ear sometimes still hurts and she has trouble hearing well out of it.

91.     At some point during her time at Cayuga, Esteffany's foot began to hurt. The shoes she had been given were too small for her. Years later, her foot still hurts on occasion when she runs.

92.     Esteffany suffered immensely at the hands of the United States government. She was traumatized by being separated from her father and flown thousands of miles away. She endured neglect so significant that she was hospitalized—with a dangerous illness—and left with lingering symptoms that recur to this day.

6.      *Marcos and Esteffany Had Limited Contact with Each Other*

93.     For several days, DHS officers provided Marcos no information about where his daughter had been taken or how to contact her. On or about May 18, 2018, a CBP officer at Sierra Blanca finally gave Marcos a phone number through which Marcos reached a case worker who worked with Esteffany and told Marcos that his daughter was at Cayuga Centers in New York, but did not allow them to speak.

According to ORR call log records, Marcos and Esteffany did not speak on the phone until June 27, 2018.

94.     Thereafter, Marcos tried to call Esteffany every few days. He didn't have the money to call her more often than that. He had quickly depleted the money he had with him when he entered the United States and was earning only $1.00 a day working in the detention facility. Even when he did call, he was sometimes told he could not speak to Esteffany. In total, Marcos recalls speaking with Esteffany approximately six times.

95.     During their conversations, Esteffany begged to be reunited with Marcos. He tried to comfort her, but he did not know if or when they would be reunited. On some occasions, the case worker interrupted the call to say that it did not make sense to continue talking because Esteffany was crying and the case worker ended the call.

96.     Several times, Marcos received distressing news from the case worker, for example, that Esteffany was distraught and barely eating. Once, he recalls the case worker telling him that Esteffany was in the hospital because she could not eat. Learning this heightened Marcos's distress, as it reinforced his realization that his detention had stripped him of his ability to make decisions regarding his daughter's wellbeing. He was unable to sleep, felt weak, and cried often.

97.     Esteffany recalls rarely being able to speak with her parents while in custody. Each time she spoke with her father at a detention facility or with her mother in El Salvador, a case worker was with her. Esteffany remembers feeling rushed through the calls with her father, and that the case worker would generally end the call after a short time, often without giving Esteffany the chance to say goodbye.

7.     *Marcos's and Esteffany's Painful Reunification*

98.     While detained in Cibola, New Mexico, Marcos had a video call with a Salvadoran consular official who notified him that he was set to be deported on July 18, 2018, and that he would be reunited with Esteffany right before their

deportation. The idea of returning to El Salvador terrified Marcos. He wanted to believe that he would see Esteffany but he was worried that officials were lying to him. Marcos had heard other detainees say that they were being deported without their children, and that the children would remain in the United States under someone else's care.

99.    Two days before Marcos's scheduled deportation, however, Judge Sabraw issued an order halting deportations of separated parents. DHS officers informed Marcos that he would now be allowed to remain in the United States. He was given documents with information about Esteffany.

100.    Around that same time, a worker at Cayuga told Esteffany that she was going to be reunited with her father soon and asked if she wanted to stay with him in the United States or return to El Salvador. Esteffany was happy to hear this news and wanted to stay in the United States with her father but found it all difficult to believe. She did not trust the staff at Cayuga and did not feel they were working to reunite her with her father. Esteffany had also heard that other kids had been told that they would be reunited with their parents only to be disappointed when it turned out to be untrue.

101.    From that point, Esteffany's living conditions improved. Her foster parent seemed more attentive to her and, for the first time, provided her with new clothes and shoes of her own that she didn't have to share with the other girls. Adults at Cayuga seemed to be more attentive as well.

102.    On or around July 17, 2018, Marcos was transported to a DHS facility in El Paso, Texas, to be reunited with Esteffany. He waited there for several more days as DHS officers brought children in to be reunited with other parents.

103.    On or around July 22, 2018, Esteffany's foster parent woke her up and told her she was going to be reunited with her dad. Officials transported Esteffany on a plane from New York to El Paso, Texas. Once there, DHS officers drove her to a facility that looked to Esteffany like a jail, where other children were waiting to be

reunited with their parents. More and more children were reunited with their parents until Esteffany was one of the few left. After more than two months apart, Marcos and Esteffany were finally reunited.

8.    *The Lasting and Harmful Effects of Separation and Detention on Marcos and Esteffany*

104.    After the government fitted Marcos's ankle with an electronic monitoring device, Marcos and Esteffany were transported to a hotel in El Paso, Texas, where a religious organization was providing aid and shelter to recently reunited families. Marcos asked the aid workers for something to treat Esteffany's lice. Approximately two days later, Marcos and Esteffany traveled to Plainfield, New Jersey where a family friend had agreed to temporarily host them.

105.    Although Marcos and Esteffany were together again, the impacts of Defendant's negligent and intentional conduct in separating and detaining Plaintiffs continued. For the first several months after being reunited, Marcos struggled with memories of the separation and his detention. He felt isolated and helpless. Marcos had no family in the United States and he did not feel that anyone could understand what he and Esteffany had gone through.

106.    In New Jersey, Marcos struggled to support himself and Esteffany. On many days, he was either too traumatized to find construction work, or Esteffany was inconsolable at the prospect of him leaving her for the day. Esteffany would sob and shake even when Marcos would leave the home briefly to go to the store. She was terrified that if he left, she would never see him again. It took at least three to six months for Marcos to feel comfortable enough leaving Esteffany's side so that he could work more regularly. Even then, however, he would frequently miss days of work when Esteffany was too distressed for him to leave. Their trauma cost Marcos the opportunity to earn money to support himself and his daughter.

107.    Marcos still has flashbacks of the separation. Seeing a uniformed police officer resurrects memories of his time in detention. If Esteffany is ever not hungry,

for whatever reason, Marcos is reminded of Esteffany's hunger when they were in immigration custody. Marcos has nightmares triggered by these memories; he feels anxious, lonely, and depressed. Anytime Marcos sees Esteffany upset or suffering, he blames himself for what she went through.

108.   Esteffany remembers being generally happy before coming to America. In the wake of the forced separation, Esteffany describes feeling that she was not herself or, as she says, "I didn't feel like I was alive." She rarely smiled. She did not want to go outside and preferred lying in bed. Esteffany felt weak and cried frequently. Even after being reunited, when she closed her eyes to go to sleep, she would remember the separation and would begin to cry. She had countless nightmares about the separation and would wake Marcos in the middle of the night for reassurance that he was not leaving again. The nightmares continue to this day.

109.   Esteffany has continued to suffer physical ailments caused by the separation and her detention. For almost four years, she has struggled with exhaustion, physical weakness, and headaches. She continues to have a low appetite and intermittent ear and foot pain.

110.    Memories of her experiences with separation and detention continue to plague Esteffany. Places that seem innocuous to others remind her of the separation; teachers remind her of Cayuga Center; uniformed police officers remind her of DHS officials. Certain smells remind her of detention. One day, Esteffany saw a woman with a lot of children and it reminded her of the trauma of being forced into foster care. Esteffany is often anxious and scared. Flashbacks play in her mind, her heart races, and she has trouble breathing.

## <u>COUNT I</u>
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

111.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

112.   Defendant's employees had legal obligations to the Plaintiffs as persons in their custody, giving rise to a special relationship between Defendant and Plaintiffs and a duty of care towards Plaintiffs, including a duty not to intentionally inflict emotional distress on Plaintiffs.

113.   By engaging in the acts described above, including but not limited to forcibly separating Marcos and Esteffany, failing to inform Marcos and Esteffany of each other's whereabouts, depriving them of contact with each other, and subjecting them to substandard conditions of custody, Defendant's employees, officials, officers, and agents, breached their duty of care to Plaintiffs. In particular, the treatment of Plaintiffs breached: (1) the *Flores* settlement agreement standards for the treatment of minors, including food, drink, hygiene, sanitation, temperature, supervision, safety, medical assistance, contact with family members, and respect and special concern for their particular vulnerability as minors; (2) ORR's obligation to place a child in the least restrictive setting that is in the best interests of the child; (3) CBP's TEDS standards governing food, drink, hygiene, bedding, temperature, documentation, and respect for family unity; (4) ICE's PBNDS, requiring humane conditions when detaining migrants; and (5) the fundamental right to family integrity under the U.S. constitution, including, but not limited to, Plaintiffs' rights to due process under the Fourteenth Amendment.

114.   Defendant's employees, officials, officers, and agents maliciously engaged in extreme and outrageous conduct with an intent to cause, or with at least a reckless disregard of the likelihood of causing, Plaintiffs to suffer severe emotional distress. The conduct detailed above includes extreme and outrageous conduct, particularly in light of the obligations arising from Defendant's duty of care toward the Plaintiffs. By violating those obligations Defendant's employees abused their authority over Plaintiffs and their power to affect Plaintiffs' interests.

115.   As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress throughout their time in government custody and continue to suffer the lasting effects of that distress today.

116.   Under the FTCA, the United States is liable to Marcos and Esteffany for intentional infliction of emotional distress and for damages in an amount to be proven.

**COUNT II**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

117.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

118.   Defendant's employees had legal obligations to the Plaintiffs as persons in their custody, giving rise to a special relationship between Defendant and Plaintiffs and a duty of care towards Plaintiffs, including a duty not to negligently inflict emotional distress on Plaintiffs.

119.   By engaging in the acts described above and violating federal standards, policies, and regulations as alleged in Count I, Defendant's employees, officials, officers, and agents engaged in negligent and grossly negligent conduct that caused Plaintiffs to suffer severe emotional distress.

120.   By engaging in the acts alleged above, Defendant's employees breached specific duties of care to Plaintiffs.

121.   As a direct and proximate result of Defendant's employees' conduct, Plaintiffs suffered and continue to suffer severe emotional distress with physical manifestations.

122.   Under the FTCA, Defendant is liable to Plaintiffs for negligent infliction of emotional distress and for damages in an amount to be proven.

### COUNT III
### ABUSE OF PROCESS

123.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

124.   By engaging in the acts alleged above, investigative or law enforcement officers employed by Defendant abused their immigration detention authority to separate Marcos and Esteffany and hold them separately with the deliberate purpose of inflicting emotional harm on Plaintiffs.

125.   The prolonged separate detention of Plaintiffs was not required for any law enforcement purpose, as any intended prosecution could have been accomplished without a ten-week separation and without transporting Esteffany thousands of miles from her father to a placement in New York.

126.   Law enforcement officers undertook this improper use of the detention process with the ulterior purpose of deterring future migrants from seeking refuge in the United States.

127.   As a result of these actions, Marcos and Esteffany suffered both physical and emotional harms as detailed above.

128.   Under the FTCA, the United States is liable to Plaintiffs for abuse of process and for damages in an amount to be proven.

### COUNT IV
### NEGLIGENCE

129.   Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

130.   Defendant and its employees, officials, officers, and agents owed a duty to Plaintiffs to exercise ordinary care so as not to cause harm or injury to Plaintiffs. Federal standards, policies, and regulations specify numerous duties of care owed towards Plaintiffs as persons in federal immigration custody. By engaging in the acts alleged above, Defendant, through its employees, officials, officers, and agents,

failed to act in accordance with those duties of care and breached those duties of care to Plaintiffs.

131.   As a direct and proximate cause of the referenced conduct, Marcos and Esteffany suffered physical, emotional, and economic injuries.

132.   Under the FTCA, Defendant is liable to Plaintiffs for negligence and for damages in an amount to be proven.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.   Compensatory damages;

B.   Attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C.   Such other and further relief as the Court deems just and appropriate.

Dated: March 3, 2023                                 **O'MELVENY & MYERS LLP**


By:      /s/ Taylor S. Simeone
Taylor S. Simeone (S.B. #327313)
Geoffrey H. Yost (S.B. #159687)
Emily Murphy*
Hye-Jin Kim (S.B. #341948)


Dated: March 3, 2023                                 **KIDS IN NEED OF DEFENSE (KIND)**


By:      /s/ Wendy Wylegala
Wendy Wylegala*
Esther Araya*
John Travis (S.B. #348813)


*Attorneys for Plaintiffs M.A.N.H. and E.B.N.A., a minor child*
[*Pro hac vice applications forthcoming*]

1

## SIGNATURE ATTESTATION

2      I hereby attest that the other signatories listed on whose behalf the filing is
submitted, concur in the filing's content and have authorized the filing.

3

4   Dated: March 3, 2023                    /s/ Taylor Simeone                    _

5                                           Taylor Simeone
                                            **O'MELVENY & MYERS LLP**
                                            *Attorney for Plaintiffs*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28