UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 23-0372 JGB (KKx)** | Date | September 22, 2023 |
|---|---|---|---|
| Title | *M.A.N.H. et al. v. United States of America* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:     **Order (1) GRANTING-IN PART and DENYING-IN-PART Defendant's Motion to Dismiss (Dkt. No. 38); and (2) VACATING the September 25, 2023 Hearing (IN CHAMBERS)**

Before the Court is United States of America's ("Defendant," or "Government") motion to dismiss plaintiff's complaint. ("Motion," Dkt. No. 38.) The Court determines the Motion appropriate for resolution without a hearing. *See* Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of, and in opposition to, the Motion, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the Motion. The September 25, 2023 hearing is **VACATED**.

## I. BACKGROUND

On March 3, 2023, M.A.N.H, individually and as parent and next friend of his minor child, E.B.N.A.,[1] filed a complaint against Defendant in which they seek damages for the allegedly inhumane treatment that a father and his then eight-year-old daughter received at the hands of the Government and its employees. ("Complaint," Dkt. No. 1.) Plaintiffs' Complaint alleges claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b)(1) and §§ 2671-2680, including (1) intentional infliction of emotional distress ("IIED"); (2) negligent infliction of emotional distress ("NIED"); (3) abuse of process; and (4) negligence. (*See*

---

[1] The Court granted permission for Plaintiffs, a father and daughter, to proceed under pseudonyms on March 14, 2023. (Dkt. No. 26.) Here, the Court will use "Marcos" to refer to M.A.N.H. and "Esteffany" to refer to E.B.N.A. (collectively, "Plaintiffs"), as Plaintiffs do in their filings.

Complaint.)  In accordance with a stipulation (Dkt. No. 39) to extend time to file a response to the Complaint, the Government filed this Motion on June 28, 2023.  (Motion.)  On July 26, 2023, Plaintiffs opposed the Motion.  ("Opposition," Dkt. No. 46.)[2]  On August 9, 2023, the Government replied.  ("Reply," Dkt. No. 47.)  On September 14, 2023, Plaintiffs filed a notice of supplemental authority.  ("Notice," Dkt. No. 49.)

## II.    FACTUAL ALLEGATIONS

Plaintiffs allege the following facts, which are assumed to be true for the purposes of this Motion.  See Swift v. California, 384 F.3d 1184, 1188 (9th Cir. 2004).

## A. The Right to Seek Asylum and Other Protection from Persecution

Seeking asylum—protection from a fear of persecution on account of a protected ground—is a right enshrined in United States statutes that implement international agreements and reflect widely accepted principles of international law.  (Id. ¶ 22.)  Unauthorized entry into the United States does not defeat the right to seek asylum.  (Id.)  Certain migrants apprehended and found to be inadmissible may be subject to "expedited removal" processing.  (Id. ¶ 23.)  In that context, if an individual expresses an intention to seek asylum or a fear of persecution, an asylum officer will conduct an interview to determine whether the individual has a credible fear of persecution.  (Id.)  If the officer determines that the individual has a credible fear of persecution, the person will be referred for further proceedings before an immigration judge, and the asylum-seeker may be released from government custody.  (Id.)

## B. Enforcement of Statutes Prohibiting Unlawful Entry

Under 8 U.S.C. § 1325(a), a noncitizen may be subject to criminal prosecution for "improper entry" if he or she "enters or attempts to enter the United States at any time or place other than as designated by immigration officers."  (Id. ¶ 24.)  Before Zero Tolerance, when DHS officials referred adults to the DOJ for criminal prosecution based on unlawful entry, it was commonplace for the charge to be disposed of with a single court appearance and a sentence of time served, and for the individual to be returned to DHS custody, often the same day. (Id. ¶ 25.)

## C. Standards Governing Apprehension and Detention of Noncitizen Children and Adults

In 1997, the Government entered into a court-approved settlement of litigation challenging the standards and conditions of children's immigration detention.  (Id. ¶ 26.)  The *Flores* Settlement requires that the United States government "treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors."  (Id.)  Further, it requires the United States Government to "hold minors in facilities

---

[2] Both Defendant's Motion and Plaintiffs' Opposition comply with the page limit requirements previously agreed upon by the Court.  (Dkt. No. 39.)

that are safe and sanitary" and to provide "access to toilets and sinks, drinking water and food . . . , medical assistance . . . , adequate temperature control and ventilation, adequate supervision . . . , and contact with family members who were arrested with the minor." (Id.) Under 8 U.S.C. § 1232(b)(1), the care and custody of all unaccompanied children is the responsibility of the Secretary of HHS.

More specifically, under 6 U.S.C. § 279(b)(1), Congress conferred a host of responsibilities on the Director of ORR, including "coordinating and implementing the care and placement of unaccompanied [noncitizen] children;" "ensuring that the interests of the child are considered in decisions and actions relating to the[ir] care and custody[;]" making and implementing placement determinations for all unaccompanied children; "identifying a sufficient number of qualified individuals, entities, and facilities to house unaccompanied [noncitizen] children;" and "overseeing the infrastructure and personnel" of such facilities. (Id. ¶ 27.) ORR's Unaccompanied Children Program Policy Guide ("Policy Guide") reflects ORR's statutory obligation to place a "child in the least restrictive setting that is in the best interests of the child." (Id. ¶ 28.) Further, the Policy Guide incorporates provisions of the *Flores* Settlement as "minimum services" that licensed care providers are required to provide. (Id.) The Policy Guide specifies that "[u]naccompanied alien children must be provided the opportunity to make a minimum of two telephone calls per week (10 minutes each) to family members and/or sponsors, in a private setting." (Id.)

In October 2015, CBP published nationwide standards governing agency interaction with detained individuals. (Id.) The TEDS Standards reflect legal and regulatory requirements as well as CBP policies and best practices. (Id. ¶ 29.) They set forth standards on safety, the condition of facilities, and providing for detainees' needs. (Id.) The TEDS Standards state that food must be provided to all adult detainees "in edible condition" and "at regularly scheduled meal times[;]" adult detainees must also "be provided with snacks between regularly scheduled meal times." (Id. ¶ 30.) Under the TEDS Standards, "[d]etainees must be provided with basic personal hygiene items" and "[a]ll facilities or hold rooms used to hold detainees must be regularly and professionally cleaned and sanitized." (Id. ¶ 31.) CBP personnel must also provide "[c]lean bedding" to all children and "clean blankets" to all adults upon request. (Id.)

Furthermore, "[w]hen it is within CBP control, officers/agents should maintain hold room temperature within a reasonable and comfortable range for both detainees and officers/agents. Under no circumstances will officers/agents use temperature controls in a punitive manner." (Id.) Importantly, the TEDS Standards also recognize "family units" as an at-risk population "who may require additional care or oversight." (Id. ¶ 32.) In particular, CBP commits to "maintain[ing] family unity to the greatest extent operationally feasible, absent a legal requirement or articulable safety or security concern." (Id.) The TEDS Standards reiterate that "[g]enerally, family units with juveniles should not be separated[,]" and where separation is necessary "due to different immigration dispositions, such separation must be documented in the appropriate electronic system(s) of record." (Id.) CBP officers are not permitted to hold "[d]etainees under the age of 18 years . . . with adult detainees, unless the adult is an immediate relative or legal guardian responsible for the care and custody of the juvenile, and no other adult

detainees are present in the area." (Id.)  The only exceptions to this standard are those "made on a case-by-case basis, based on family unity." (Id.)

In 2011, ICE published nationwide standards governing conditions of immigration detention.  (Id. ¶ 33.)  The last revision to the PBNDS prior to Family Separation was published in 2016. (Id.)  The PBNDS reflect "federal legal and regulatory requirements as well as prior ICE policies and policy statements."  (Id.)  They set forth standards on safety, the condition of facilities, and providing for food, water, medical, legal, and other needs.  (Id.)  In the PBNDS, ICE acknowledges that it "exercises significant authority" when detaining migrants and therefore "must do so in the most humane manner possible with a focus on providing sound conditions and care."  (Id. ¶ 34.)

The United States government owes a duty of care to the migrant families and individuals in its custody. (Id. ¶ 36.)  The leadership of CBP, ICE, and ORR have affirmed these duties in their agency policies, including but not limited to the authorities described above.  (Id.)  These policies also reflect the special relationship between each of these agencies and the migrants in their custody.  (Id.)  Through Family Separation, the United States failed in these mandatory duties and obligations.  (Id.)

**D. Implementation of Family Separation**

In 2016, a DHS Advisory Committee—formed to provide advice and recommendations about ICE's family residential centers in response to controversy over family detention policies—concluded that "the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children" and that "[f]amily separation in these circumstances raises serious concerns and violates the best interests of the child—which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members."  (Id. ¶ 37.)

Notwithstanding those findings, by February 2017, United States employees within the Trump Administration were planning to separate families arriving at the southern border and seeking to enter the United States.  (Id. ¶ 38.)  These employees intended that the prospect of being separated would discourage individuals, including asylum-seekers, from coming to the United States.  (Id.)  A February 16, 2017 email from an HHS employee to a White House official acknowledges this objective of deterrence: "DHS proposes separating children in family units from their parents and referring them to ORR as Unaccompanied Alien Children (UACs) . . . as a deterrent to families who have not yet entered the U.S."  (Id.)

The contemplated family separations contravened DHS's own 2016 Advisory Committee report and represented a sharp departure from longstanding domestic and international law principles in favor of family unity.  (Id. ¶ 39.)  Contemporaneously, warnings about foreseeable impacts of Family Separation came from within the government and the private sector.  (Id. ¶ 40.)  As early as February 2017, Jonathan White, ORR's Deputy Director for Children's Programs—a senior career employee responsible for managing ORR's care and custody of

unaccompanied children—repeatedly raised concerns about both child welfare consequences of family separation, and the operational and capacity implications for the ORR UC program. (Id.) Tricia Swartz, Associate Deputy Director for ORR, observed that, as of March 2017, children traveling to the United States with their parents "tend to skew heavily toward tender aged children" who "require[] specialized care," requiring the UC program to address "a variety of particular needs . . . such as weaning and traumatization of separation." (Id.) Swartz also anticipated that complications in discharging separated children would result in longer stays in government custody. (Id.) Further, she observed that the "separation of children from their families could be considered a human rights abuse" and "could increase the risk of human trafficking." (Id.)

In a March 2017 public statement reacting to media reports of a proposal to separate mothers and children at the border, the American Academy of Pediatrics warned of the damage to "vulnerable, scared children" and urged federal authorities to "exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents or other relatives and caregivers." (Id. ¶ 41.)

In spite of such foreseeable issues, federal agencies proceeded to implement family separation in the form of a pilot program based in the Border Patrol's El Paso Sector from approximately July to November of 2017 (the "Pilot Program"). (Id. ¶ 42.) In 2021, a report of the DOJ Inspector General's ("DOJ IG") Office would determine that "DOJ officials . . . did not attempt to inform themselves, prior to implementation of the zero tolerance policy, about the problems that arose" during the Pilot Program, including with regard to ORR capacity to accommodate separated children. (Id. ¶ 42.)

**E. "Zero Tolerance Policy"**

On April 6, 2018, then Attorney General ("A.G.") Jeff Sessions announced Zero Tolerance,[3] directing U.S. Attorney's Offices on the southwest border "to prosecute all Department of Homeland Security referrals of section 1325(a) violations, to the extent practicable." (Id. ¶ 43.) On April 23, 2018, Kirstjen Nielsen, the Secretary of DHS at the time, authorized a DHS policy of seeking unlawful entry "prosecution of all amenable adults . . . including those presenting with a family unit." (Id.) In public remarks on Zero Tolerance on May 7, 2018, A.G. Sessions stated, "If you are smuggling a child, then we will prosecute you and that child will be separated from you *as required by law*." (Id. ¶ 44.) Multiple DOJ leaders would later confirm that Sessions understood that expanding prosecutions for unlawful entry to all adults, including those in family units, would result in family separations. (Id.) Separating families was *not* required by any statute or regulation. (Id.)

---

[3] Forced family separations occurred before and after the official dates of the Zero Tolerance Policy. (Complaint ¶ 4.) The government acknowledges that at least 3,924 children were forcibly separated from their parents under this policy. (Id.)

In 2021, the DOJ Inspector General found that "Department leadership and, in particular, the Office of the Attorney General (OAG), which had primary responsibility for the policy's development, failed to effectively prepare for, or manage, the implementation of the zero tolerance policy." (Id. ¶ 45.)  In particular, "the Department's single-minded focus on increasing prosecutions came at the expense of careful and appropriate consideration of the impact that prosecution of family unit adults and family separations would have on children traveling with them and the government's ability to later reunite the children with their parents." (Id.)  Further, the DOJ IG found "no evidence that DOJ leadership engaged in discussions . . . about a process for expediting prosecutions of family unit adults so that child separations would not occur."  (Id.)  After reviewing the DOJ IG's report, former Deputy Attorney General Rod Rosenstein admitted that "[t]he government was not prepared to deal with [family separations]," and that prosecution of adults in family units "should not have been implemented."  (Id.)

DOJ leadership did not provide effective coordination within and among federal agencies implementing Family Separation.  (Id. ¶ 46.)  DOJ leadership did not inform the relevant U.S. Attorneys' Offices, the U.S. Marshals Service ("U.S. Marshals"), HHS, or even the Office of the Deputy Attorney General about the implementation of Zero Tolerance prior to Sessions' announcement of it on April 6, 2018.  (Id.)  Senior HHS officials noted that they first learned about the implementation of Family Separation when the media reported it.  (Id.)  That lack of coordination hindered—among other efforts—ORR's ability to plan for family separations, leading to insufficient bed capacity for separated children, care provider facilities struggling to meet children's needs, and difficulty identifying separated children for reunification.  (Id.)

DOJ leadership were or should have been aware of numerous operational challenges prior to implementing Family Separation, but did not alter Family Separation to address them.  (Id. ¶ 47.)  Similarly, DHS leadership knew or should have known from its experience with the Pilot Program that it did not have a system capable of accurately tracking separated families.  (Id. ¶ 48.)

Prior to April 2018, DHS and HHS data systems did not systematically collect and maintain information to indicate when a child was separated from his or her parents.  (Id.)  When DHS employees adopted ad hoc techniques to work around technical limitations, those techniques actually "introduced data errors that further hindered [ICE] officers' ability to track migrant parents separated from their children."  (Id.)

Prior to July 2018, tracking of separated children by ORR staff was not comprehensive, not formalized in procedures, and relied on informal tools such as an Excel spreadsheet and later a SharePoint database.  (Id.)  In addition, as the HHS Office of the Inspector General ("HHS IG") found in a 2020 report, "HHS and DHS did not routinely . . . share the information necessary to identify, track, or connect families separated by DHS."  (Id.)  As such, it concluded that "[p]oor interagency communication and internal management decisions that failed to protect children's interests left HHS unprepared for the zero-tolerance policy," and that the "lack of preparation impeded HHS's ability to identify, care for, and reunify separated children."  (Id.)

During Family Separation, U.S. Attorney's Offices "struggled to provide information about separated families in response to judicial inquiries and were frustrated in their efforts to gather additional information from DOJ headquarters, DHS, and HHS about the separation and reunification process." (Id.) Meanwhile, judges and defense attorneys continued to raise concerns about the separation and tracking of children. (Id.) At a federal judges' conference, for example, DOJ officials fielded "heavy criticism from both Article III and Magistrate Judges for how the [government] has been handling issues related to children." (Id.)

As anticipated in multiple early warnings about Family Separation, the effects on families were traumatic. (Id.) Separated children exhibited fear, post-traumatic stress, anxiety, and feelings of loss and abandonment; some "expressed acute grief that caused them to cry inconsolably." (Id.) In short, "HHS's inadequate communication, management, and planning made the situation worse for many separated children." (Id.)

Because DOJ leadership did not include representatives from the U.S. Marshals in planning Family Separation prior to implementing it, U.S. Marshals faced issues including insufficient bed space and medical care for detainees. (Id. ¶ 49.) Moreover, even though ORR policy required case managers to coordinate biweekly phone calls between children in ORR custody and their family members, employees with the U.S. Marshals often failed to facilitate those communications, which delayed establishing contact between separated family members. (Id. ¶ 50.) Some U.S. Marshals managers were even completely unfamiliar with ORR and had to research it on the internet. (Id.) U.S. Marshals staff shortages and parents' inability to pay telephone charges also contributed to delays in connecting separated family members. (Id.) In at least one district, the lack of guidance within U.S. Marshals "resulted in delays of 1 to 8 weeks before separated children and parents in custody could establish contact." (Id.)

DHS informed DOJ leadership that Family Separation was taxing its resources. CBP facilities were holding separated children for "long periods in facilities intended solely for short-term detention." (Id. ¶ 51.)

**F. The President Orders an End to Family Separation**

Only after Family Separation garnered widespread condemnation did then-President Trump sign an executive order, on June 20, 2018, announcing an end to Zero Tolerance. (Id. ¶ 52.) The executive order stated that it was the "policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." (Id.) The executive order, however, did not explain whether or how the federal government would *reunify* children who had been separated from their parents. (Id.) In fact, on June 22, 2018, the government admitted that it had no reunification procedure in place. (Id.) Worse, even after the executive order, officials forcibly separated thousands more children from their parents. (Id.) It was not until June 26, 2018, when a federal judge in *Ms. L. v. U.S. Immigration and Customs Enforcement* ordered the government to reunify families, that the United States government finally began taking steps to do so. (Id. ¶ 53.)

**G. The Government's Failure to Track Separated Families Led to Delays in Reunification**

The agencies involved in separating families had failed to collect complete, reliable, and consistent data that would permit prompt and safe reunification. (Id. ¶ 54.)  HHS officials and employees struggled to physically reunite families, resulting in "children having to wait for parents for unreasonably long amounts of time and parents transported to the wrong facilities." (Id.)  Though DHS claimed in June 2018 that it had a "centralized database" of separated families, no such database was located and ICE employees tasked with reunification had not heard of such a database.  (Id. ¶ 55.)

Absent a centralized database with reliable information, agencies resorted to a variety of inefficient and ineffective methods to attempt to reunify families.  (Id. ¶ 56.)  On average, it took weeks to simply locate a parent, then additional days to arrange a phone call, a necessary first step toward reunification.  (Id.)  Longer stays at care provider facilities resulted in deteriorating mental health for some children.  (Id.)

**H. Plaintiffs Suffer Under Family Separation**

Marcos and Esteffany fled El Salvador after Marcos received death threats from MS-13 gang members.  (Id. ¶ 58.)  Fearing for their lives, Marcos and Esteffany came to the United States to seek asylum.  (Id. ¶ 59.)

Marcos did not know the procedures for applying for asylum.  (Id. ¶ 60.)  He believed that United States immigration officials would explain it to him once he and Esteffany safely reached the United States.  (Id.)  On May 8, 2018, after traveling for approximately ten days, Marcos and his daughter crossed the United States border near El Paso, Texas.  (Id. ¶ 61.)  Shortly after crossing, Marcos spotted a law enforcement vehicle and approached the officers, believing this would be the first step in securing safety for him and his daughter in the United States.  (Id.)  Marcos identified himself to the Border Patrol officer and stated that he intended to seek asylum. (Id.)  The officer told Marcos that the rules had changed and that he would be going to jail and his daughter would be taken from him.  (Id.)  Though he had no authority to say so, the officer told Marcos that the United States was not granting asylum to anyone anymore.  (Id.)

The officers drove Marcos and Esteffany to a nearby Border Patrol Station—on information and belief, the Paso del Norte Station in El Paso, Texas, and confiscated all of Marcos's and Esteffany's belongings, including their money, passports, Marcos's phone, and whatever clothes they were not then wearing.  (Id. ¶ 62.)

Marcos and Esteffany were held in a room for about twenty hours.  (Id. ¶ 63.)  During this time, CBP officers gave them no opportunity to brush their teeth, shower, or change their clothes.  (Id.)  Both were extremely hungry and cold, with nowhere to sleep except on the concrete floor or a bench.  (Id.)  Esteffany, frightened and cold, found it difficult to sleep with the constant sound of other children crying.  (Id.)

**CIVIL MINUTES—GENERAL**                 Initials of Deputy Clerk NP

The next day, May 9, 2018, Esteffany was left in the room while a CBP officer took Marcos to another room where he was shown a video in Spanish. (Id. ¶ 64.) He recalls that the video explained that the children would be taken to a shelter, where they would be taken care of and attend school until being reunited with their parents or another relative. (Id.) From this Marcos understood that Esteffany would be taken from him. (Id.) He was devastated. (Id.)

A few hours later, a CBP officer entered the room and told the children to say goodbye to their parents. (Id. ¶ 65.) Esteffany began to cry, hugged her dad, and told him that she loved him. (Id.) Hugging and kissing his daughter, Marcos told her, through his tears, that she was going to be okay. (Id.) The CBP officer then took Esteffany away. (Id.) CBP officers refused to tell Marcos how long he would be separated from his eight-year-old daughter or where she was being taken. (Id. ¶ 66.)

Although federal officials justified Zero Tolerance on the basis that it would allow for the prosecution of all adults crossing the border unlawfully, on information and belief, the United States never prosecuted Marcos. (Id. ¶ 67.)

For over two months, from May 9, 2018, until approximately July 22, 2018, the United States held Marcos in a series of approximately seven facilities in Texas and New Mexico. (Id. ¶ 68.) Marcos was mistreated--Marcos was held in small, cold rooms, he had to sleep on the floor without a blanket or pillow, he was not given an opportunity to shower, brush his teeth, change his clothes, or go outside. (Id. ¶ 69-71.) Anxious about his daughter's well-being, he had no appetite for food or drink, and began to suffer from dehydration. (Id. ¶ 69.) Several officers misled Marcos about his legal right to seek asylum. (Id. ¶ 70.) CBP officers repeatedly told him that the United States was no longer offering asylum and that Marcos was not eligible anyway.

On information and belief, DHS next transported Marcos by bus to the West Detention Facility in Sierra Blanca, Texas. (Id. ¶ 72.) Officers locked Marcos in a cell-like room with approximately eighty other men. (Id.) He now had a bunk and was able to shower, brush his teeth, and change clothes, but he was still denied any news of his daughter and not permitted to contact her. (Id.) After approximately a week, an officer gave Marcos a phone number and the name of someone who was with Esteffany. (Id.) He called the number, spoke with Esteffany's ORR case manager, and learned for the first time that Esteffany was thousands of miles away in New York. (Id.) When Marcos asked to speak with his daughter, he was told that Esteffany was unavailable. (Id.)

During his time in Sierra Blanca, Marcos learned from another detainee that he could request a "credible fear interview." (Id. ¶ 73.) He requested the interview, but no one told him when it would be scheduled or what was involved. (Id.) At some point during his detention, DHS transported Marcos and other detainees to a courthouse where he waited for a time before DHS took Marcos and the other detainees back to their detention facility without having seen a judge. (Id. ¶ 74.) According to DHS records, prosecution of Marcos was declined due to time constraints.

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk NP

On or around May 26, 2018, ICE transported Marcos by bus to the Cibola County Correctional Center in Milan, New Mexico.  (Id. ¶ 76.)  Officers handcuffed Marcos's wrists to his waist and cuffed his feet for the duration of the half-day journey except for one stop for food and to use the restroom.  (Id.)  At Cibola, officers placed Marcos in a room with about twenty other men.  (Id.)

On May 31, 2018, without giving him any time to prepare or the opportunity to seek legal advice, a USCIS asylum officer conducted Marcos' credible fear interview.  (Id. ¶ 77.)  Marcos tried to explain to the immigration officer the reasons that he had fled El Salvador.  (Id.)  On June 7, 2018, the asylum officer issued a decision finding Marcos's testimony credible, yet finding that Marcos would be unable to establish that his fear of persecution was on account of any of the protected grounds, as required to be granted asylum.  (Id. ¶ 78.)  A USCIS asylum officer informed Marcos of the results of his interview and that he could appeal the decision to an immigration judge or agree to be deported.  (Id.)  The USCIS asylum officer also told Marcos that if he chose the latter, he would be reunified with his daughter.  (Id.)  Demoralized and believing the numerous previous claims by CBP officers that the United States was no longer granting asylum, Marcos declined to appeal the decision.  (Id.)  Despite his fear of persecution in El Salvador, he was overwhelmed by his continued separation from his daughter and desperately wanted to be reunited with her.  (Id.)  In November 2018, as a result of a settlement agreement in the *Ms. L* litigation, post-separation credible fear interviews—like the one given to Marcos—were determined to be invalid because of the severe distress that parents suffered while being separated from their children.  (Id. ¶ 79.)

Marcos was detained in New Mexico for around 53 days.  (Id. ¶ 80.)  While the conditions of his detention were often poor, Marcos's separation from Esteffany caused him the greatest distress.  (Id.)  Often unable to eat or sleep, he lost weight, often felt weak, and did not speak much with other detainees.  (Id.)  He felt depressed, anxious, angry, and desperate.  (Id.)  On the rare occasions when he did speak with Esteffany, hearing her cry made him feel worse, he blamed himself.  (Id.)  To this day, he cannot help but cry when he thinks about what Esteffany went through.  (Id.)

After separating Esteffany from her father on May 9, 2018, CBP officers put her and other separated children on a bus.  (Id. ¶ 81.)  The other children appeared to be as young as Esteffany or younger.  (Id.)  The bus had bars on its windows and was sectioned into cells.  (Id.)  Its windows were tinted so the children could not see out.  (Id.)  When Esteffany and the other children began to cry, no one comforted them.  (Id.)  Instead, the officer driving the bus shouted at the children, telling them that if they kept crying, they would never see their parents again.  (Id.)

After a few hours of travel, Esteffany and the other children arrived at another detention facility.  (Id. ¶ 82.)  Federal officers put Esteffany in a cold, jail-like room with a few other girls where she stayed for approximately three days.  (Id.)  Esteffany slept on a bed that folded down from the wall with a blanket but no pillow.  (Id.)  She was given food once per day.  (Id.)  She was

not given the opportunity to shower, brush her teeth, or change clothes.  (<u>Id.</u>)  She did have access to a bathroom, but there was no soap or toilet paper, and it was not private.  (<u>Id.</u>)  The children were rarely checked on except to slide their food through a slot in the door.  (<u>Id.</u>)

On or around May 11, 2018, adults who Esteffany believes were CBP officers took her in a car with a different group of children to an airport.  (<u>Id.</u> ¶ 83.)  It was her first time at an airport and Esteffany had never been on a plane.  (<u>Id.</u>)  Esteffany was scared, hungry, and crying.  (<u>Id.</u>)  The officers put her on a plane that was filled with other children.  (<u>Id.</u>)  They told Esteffany that she would see her father again if she followed their instructions.  (<u>Id.</u>)

While under United States custody, Esteffany was flown more than 2,000 miles to New York City.  (<u>Id.</u> ¶ 84.)  Once there, federal employees transferred her into the custody of HHS and the care of Cayuga Centers, an organization that places children in foster homes (sometimes with multiple other unaccompanied minors in the same home) and provides all-day programming for those children.  (<u>Id.</u>)

According to ORR data, Cayuga Centers housed the largest number of separated children in custody as of June 26, 2018.  (<u>Id.</u> ¶ 85)  But Cayuga Centers was unprepared to handle this volume of separated children, and, according to a Cayuga Centers employee, it had an insufficient number of case managers, medical staff, and teachers for its growing population.  (<u>Id.</u>)

Esteffany was assigned to live with a woman in her apartment in New York City.  (<u>Id.</u> ¶ 86.)  In the three-bedroom apartment, one room housed the woman, another housed Esteffany and three other girls, and a third housed four boys.  (<u>Id.</u>)  Esteffany came to learn from the other children that they had also been separated from their parents.  (<u>Id.</u>)  Esteffany was provided with a bed and she shared clothes and shoes with the other girls in her room.  (<u>Id.</u>)  Her foster parent would sometimes leave the apartment to run errands.  (<u>Id.</u>)  At least once, Esteffany's foster parent arranged for her boyfriend to watch Esteffany and the other children when she was out of the house—this made Esteffany uncomfortable.  (<u>Id.</u>)

Every morning, all the children took a train ride of approximately 30 minutes to Cayuga Centers.  (<u>Id.</u> ¶ 87.)  The center provided lunch but Esteffany didn't eat much as she lost her appetite and the food was often unappetizing.  (<u>Id.</u>)

During her stay in New York, Esteffany suffered severe emotional and physical distress, including being hospitalized for several days due to illness.  (<u>Id.</u> ¶ 88.)  Esteffany stated that throughout it all she felt that no one seemed to be worried about her.  (<u>Id.</u>)  No one asked how she was doing or expressed concern for her.  (<u>Id.</u>)  The only exception was her time in the hospital, where Esteffany recalls the doctors were kind to her and took care of her.  (<u>Id.</u>)  A few days after arriving in the United States, Esteffany felt her head begin to itch.  (<u>Id.</u>)  It continued to itch for the rest of her time in United States custody.  (<u>Id.</u>)  Esteffany had contracted head lice, but, according to Esteffany, none of Defendant's employees ever acknowledged the infestation or

took steps to treat it.  (Id.)  Esteffany observed that many other children around her seemed to suffer from head lice as they were frequently scratching their heads.  (Id.)

Being separated from her father was devastating for Esteffany.  (Id. ¶ 89.)  She was sad every day.  (Id.)  Esteffany recalls going to the bathroom in the middle of the night to cry in silence.  (Id.)  She lost her appetite.  (Id.)  She often felt dizzy and weak.  (Id.)  At times, she could barely sit up or stand.  (Id.)  She was dehydrated and malnourished.  (Id.)  She lost weight. (Id.)

Around May 25, 2018, Esteffany felt ill with severe throat pain.  (Id. ¶ 90.)  She had been unable to eat and appeared dehydrated.  (Id.)  She collapsed in class.  (Id.)  Esteffany had a fever, bumps on her tongue, and an ear infection.  (Id.)  Esteffany was admitted to Harlem Hospital in Manhattan, where she was diagnosed with coxsackie virus, Scarlet fever, conjunctivitis, and an ear infection.  (Id.)  She remained there for several days.  (Id.)  Esteffany remembers her foster parent visiting her only once.  (Id.)  Her ear infection was painful, and she temporarily lost hearing in that ear.  (Id.)  Esteffany does not recall going to the doctor again after she was released from the hospital, and it took several weeks for her ear to feel better.  (Id.)  Even now, years later, Esteffany's ear still sometimes hurts and she has trouble hearing well out of it.  (Id.)

At some point during her time at Cayuga, Esteffany's foot began to hurt.  (Id. ¶ 91.)  The shoes she had been given were too small for her.  (Id.)  Years later, her foot still hurts on occasion when she runs.  (Id.)

Esteffany suffered immensely at the hands of the United States government.  (Id. ¶ 92.) She was traumatized by being separated from her father and flown thousands of miles away.  (Id.) She endured neglect so significant that she was hospitalized—with a dangerous illness—and left with lingering symptoms that recur to this day.  (Id.)

For several days, DHS officers provided Marcos no information about where his daughter had been taken or how to contact her.  (Id. ¶ 93.)  On or about May 18, 2018, a CBP officer at Sierra Blanca finally gave Marcos a phone number through which Marcos reached a case worker who worked with Esteffany and told Marcos that his daughter was at Cayuga Centers in New York, but did not allow them to speak.  (Id.)  According to ORR call log records, Marcos and Esteffany did not speak on the phone until June 27, 2018.  (Id.)  Thereafter, Marcos tried to call Esteffany every few days.  (Id. ¶ 94.)  He didn't have the money to call her more often than that. (Id.)  He had quickly depleted the money he had with him when he entered the United States and was earning only $1.00 a day working in the detention facility.  (Id.)  Even when he did call, he was sometimes told he could not speak to Esteffany.  (Id.)  In total, Marcos recalls speaking with Esteffany approximately six times.  (Id.)

During their conversations, Esteffany begged to be reunited with Marcos.  (Id. ¶ 95.)  He tried to comfort her, but he did not know if or when they would be reunited.  (Id.)  On some occasions, the case worker interrupted the call to say that it did not make sense to continue talking because Esteffany was crying and the case worker ended the call.  (Id.)

Several times, Marcos received distressing news from the case worker, for example, that Esteffany was distraught and barely eating.  (Id. ¶ 96.)  Once, he recalls the case worker telling him that Esteffany was in the hospital because she could not eat.  (Id.)  Learning this heightened Marcos's distress, as it reinforced his realization that his detention had stripped him of his ability to make decisions regarding his daughter's wellbeing.  (Id.)  He was unable to sleep, felt weak, and cried often.  (Id.)

Esteffany recalls rarely being able to speak with her parents while in custody.  (Id. ¶ 97.)  Each time she spoke with her father at a detention facility or with her mother in El Salvador, a case worker was with her.  (Id.)  Esteffany remembers feeling rushed through the calls with her father, and that the case worker would generally end the call after a short time, often without giving Esteffany the chance to say goodbye.  (Id.)

While detained in Cibola, New Mexico, Marcos had a video call with a Salvadoran consular official who notified him that he was set to be deported on July 18, 2018, and that he would be reunited with Esteffany right before their deportation.  (Id. ¶ 98.)  The idea of returning to El Salvador terrified Marcos.  (Id.)  He wanted to believe that he would see Esteffany but he was worried that officials were lying to him.  (Id.)  Marcos had heard other detainees say that they were being deported without their children, and that the children would remain in the United States under someone else's care.  (Id.)

Two days before Marcos's scheduled deportation, however, Judge Sabraw issued an order halting deportations of separated parents.  (Id. ¶ 99.)  DHS officers informed Marcos that he would now be allowed to remain in the United States.  (Id.)  He was given documents with information about Esteffany.  (Id.)

Around that same time, a worker at Cayuga told Esteffany that she was going to be reunited with her father soon and asked if she wanted to stay with him in the United States or return to El Salvador.  (Id. ¶ 100.)  Esteffany was happy to hear this news and wanted to stay in the United States with her father but found it all difficult to believe.  (Id.)  She did not trust the staff at Cayuga and did not feel they were working to reunite her with her father.  (Id.)  Esteffany had also heard that other kids had been told that they would be reunited with their parents only to be disappointed when it turned out to be untrue.  (Id.)

From that point, Esteffany's living conditions improved.  (Id. ¶ 101.)  Her foster parent seemed more attentive to her and, for the first time, provided her with new clothes and shoes of her own that she didn't have to share with the other girls.  (Id.)  Adults at Cayuga seemed to be more attentive as well. (Id.)

On or around July 17, 2018, Marcos was transported to a DHS facility in El Paso, Texas, to be reunited with Esteffany.  (Id. ¶ 102.)  He waited there for several more days as DHS officers brought children in to be reunited with other parents.  (Id.)

On or around July 22, 2018, Esteffany's foster parent woke her up and told her she was going to be reunited with her dad. (Id. ¶ 103.) Officials transported Esteffany on a plane from New York to El Paso, Texas. (Id.) Once there, DHS officers drove her to a facility that looked to Esteffany like a jail, where other children were waiting to be reunited with their parents. (Id.) More and more children were reunited with their parents until Esteffany was one of the few left. (Id.) After more than two months apart, Marcos and Esteffany were finally reunited. (Id.)

After the government fitted Marcos's ankle with an electronic monitoring device, Marcos and Esteffany were transported to a hotel in El Paso, Texas, where a religious organization was providing aid and shelter to recently reunited families. (Id. ¶ 104.) Marcos asked the aid workers for something to treat Esteffany's lice. (Id.) Approximately two days later, Marcos and Esteffany traveled to Plainfield, New Jersey where a family friend had agreed to temporarily host them. (Id.)

Although Marcos and Esteffany were together again, the impacts of Defendant's negligent and intentional conduct in separating and detaining Plaintiffs continued. (Id. ¶ 105.) For the first several months after being reunited, Marcos struggled with memories of the separation and his detention. (Id.) He felt isolated and helpless. (Id.) Marcos had no family in the United States and he did not feel that anyone could understand what he and Esteffany had gone through. (Id.)

In New Jersey, Marcos struggled to support himself and Esteffany. (Id. ¶ 106.) On many days, he was either too traumatized to find construction work, or Esteffany was inconsolable at the prospect of him leaving her for the day. (Id.) Esteffany would sob and shake even when Marcos would leave the home briefly to go to the store. (Id.) She was terrified that if he left, she would never see him again. (Id.) It took at least three to six months for Marcos to feel comfortable enough leaving Esteffany's side so that he could work more regularly. (Id.) Even then, however, he would frequently miss days of work when Esteffany was too distressed for him to leave. (Id.) Their trauma cost Marcos the opportunity to earn money to support himself and his daughter. (Id.)

Marcos still has flashbacks of the separation. (Id. ¶ 107.) Seeing a uniformed police officer resurrects memories of his time in detention. (Id.) If Esteffany is ever not hungry, for whatever reason, Marcos is reminded of Esteffany's hunger when they were in immigration custody. (Id.) Marcos has nightmares triggered by these memories; he feels anxious, lonely, and depressed. (Id.) Anytime Marcos sees Esteffany upset or suffering, he blames himself for what she went through. (Id.)

Esteffany remembers being generally happy before coming to America. (Id. ¶ 108.) In the wake of the forced separation, Esteffany describes feeling that she was not herself or, as she says, "I didn't feel like I was alive." (Id.) She rarely smiled. (Id.) She did not want to go outside and preferred lying in bed. (Id.) Esteffany felt weak and cried frequently. (Id.) Even after being reunited, when she closed her eyes to go to sleep, she would remember the separation and would begin to cry. (Id.) She had countless nightmares about the separation and would wake

Marcos in the middle of the night for reassurance that he was not leaving again.  (Id.)  The nightmares continue to this day.  (Id.)

Esteffany has continued to suffer physical ailments caused by the separation and her detention.  (Id. ¶ 109.)  For almost four years, she has struggled with exhaustion, physical weakness, and headaches.  (Id.)  She continues to have a low appetite and intermittent ear and foot pain.  (Id.)  Memories of her experiences with separation and detention continue to plague Esteffany.  (Id. ¶ 110.)  Places that seem innocuous to others remind her of the separation; teachers remind her of Cayuga Center; uniformed police officers remind her of DHS officials.  (Id.)  Certain smells remind her of detention.  (Id.)  One day, Esteffany saw a woman with a lot of children and it reminded her of the trauma of being forced into foster care.  (Id.)  Esteffany is often anxious and scared.  (Id.)  Flashbacks play in her mind, her heart races, and she has trouble breathing.  (Id.)

Plaintiffs Marcos and Esteffany bring this action under the FTCA, seeking compensation for the harms they suffered due to the tortious conduct of employees of the United States, from the officials who formulated Family Separation to the officers and employees who implemented it.  (Id. ¶ 11.)

### III.   LEGAL STANDARD

The Government moves to dismiss all of Plaintiffs' FTCA claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Motion.)

### A.  FTCA

The FTCA provides a limited waiver of the sovereign immunity of the United States for torts committed by federal employees acting within the scope of their employment.  Nurse v. United States, 226 F.3d 996, 1000 (9th Cir. 2000).  However, the FTCA's waiver of immunity is limited by a number of statutory exceptions, and if a cause of action falls within one of these exceptions, then the federal court lacks subject matter jurisdiction over the claim.  Id.

### B.  Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject matter jurisdiction, without which a federal district court cannot adjudicate the case before it.  See Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375 (1994).  Pursuant to Rule 12(b)(1), a party may seek dismissal of an action for lack of subject matter jurisdiction "either on the face of the pleadings or by presenting extrinsic evidence."  Sierra v. Dep't. of Family and Children Servs., 2016 WL 3751954, at *3 (C.D. Cal. Feb. 26, 2016) (quoting Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003)).  Thus, a jurisdictional challenge can be either facial or factual.  White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).

In a facial attack, the moving party asserts that the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction.  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004).  When evaluating a facial attack, the court must accept the factual allegations in the plaintiff's complaint as true.  Comm. for Immigrant Rights of Sonoma County. v. County. of Sonoma, 644 F. Supp. 2d 1177, 1189 (N.D. Cal. 2009).

"By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  Safe Air for Everyone, 373 F.3d at 1039.  In resolving a factual challenge, the court "need not presume the truthfulness of the plaintiff's allegations" and "may look beyond the complaint to matters of public record without having to convert the motion into one for summary judgment."  White, 227 F.3d at 1242.  "Where jurisdiction is intertwined with the merits, [the Court] must 'assume the truth of the allegations in the complaint . . . unless controverted by undisputed facts in the record.'"  Warren, 328 F.3d at 1139 (quoting Roberts v. Corrothers, 812 F.2d 1173, 1177 (9th Cir. 1987)).

## C.   Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Ileto v. Glock Inc., 349 F.3d 1191, 1199-1200 (9th Cir. 2003).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint— as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).  Courts are not required, however, "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  In re Gilead Scis. Sec. Litig., 536 F.2d 1049, 1055 (9th Cir. 2008) (internal citation and quotation omitted).  Courts also need not accept as true allegations that contradict facts which may be judicially noticed.  See Mullis, 828 F.2d at 1388.

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Id. at 570; Ashcroft v. Iqbal, 556 U.S. 662 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and

plausibility of 'entitlement to relief.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556).  The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

## D.  Rule 15

Federal Rule of Civil Procedure 15 ("Rule 15") provides that leave to amend "shall be freely given when justice so requires."  Fed. R. Civ. P. 15(a).  "'This policy is to be applied with extreme liberality.'"  Eminence Capital, L.L.C. v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)).  A "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by allegation of other facts."  Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal citation and quotation omitted).

## IV.  DISCUSSION

This action arises out of the separation of Plaintiffs, father and daughter, from one another under the Government's family separation policy.  Plaintiffs assert four causes of action under the FTCA: (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; (3) abuse of process; and (4) negligence.  (See Complaint.)  The Government moves to dismiss all claims on the grounds that the Court lacks subject matter jurisdiction based on exceptions under the FTCA sovereign immunity waiver, including: (1) systemic or institutional torts exception; (2) discretionary function exception; (3) due care exception; (4) private person analogue; and (5) independent contractor exception.[4]  (See Motion.)  The Government also argues that the Court should dismiss Plaintiffs' claims because they fail to state a claim under Texas state law.  (Id.)  The Court will address each exception and will then turn to the merits.

---

[4] The Government attempts to raise two additional exceptions to the FTCA's waiver of sovereign immunity—the misrepresentation exception (28 U.S.C. § 2680(h)) and an exception for claims arising out of the detention of goods (28 U.S.C. § 2680(c)).  (Motion at 26.)  Plaintiffs argue that because they do not bring claims for misrepresentation, conversion, or anything remotely similar, these exceptions do not apply to the instant case.  (Opposition at 21.)  "To the degree Plaintiffs allege that federal officers misled Marcos about his right to seek asylum and failed to return his and Esteffany's belongings, these allegations are 'only collaterally involved' with Plaintiffs' claims regarding their separation and thus cannot support either exception.  (Id.)  Mundy v. United States, 983 F.2d 950, 953 (9th Cir. 1993) (reversing grant of a motion to dismiss based on misrepresentation exception where allegation of misrepresentation did not "form[] the basis of" plaintiff's negligence claim).  The Court agrees with Plaintiffs and rejects the Government's arguments as to these two exceptions.

## A.  Systemic or Institutional Torts Exception

The Government argues that Plaintiffs' claims are impermissible because they constitute institutional or systemic tort claims, rather than allegations of "tortious acts or omissions by individual federal employees." (Id. at 8.)  The FTCA's limited waiver of sovereign immunity allows a plaintiff to sue the United States for damages arising from certain torts committed by federal employees acting within the scope of their employment. Valdez v. United States, 56 F.3d 1177, 1179 (9th Cir. 1995) (citing 28 U.S.C. § 1346(b)).  Plaintiffs aptly point to "numerous courts" which have rejected the Government's argument that FTCA claims arising from forced family separation are "systemic claims attempting to hold the United States directly liable under the FTCA, rather than alleging tortious conduct by individual federal employees." (Opposition at 7); see, e.g., Rodriguez v. United States, 2022 WL 19237182, at *4 (C.D. Cal. 2022) (citing Wilbur P.G. v. United States, 2022 WL 3024319, at *6 (N.D. Cal. May 10, 2022)); A.F.P. v. United States, 2022 WL 2704570, at *18 (E.D. Cal. July 12, 2022); B.A.D.J. v. United States, 2022 WL 11631016, at *5 (D. Ariz. Sept. 30, 2022).  The Court agrees with the ruling of these courts, and with Plaintiffs.

Throughout its Motion, the Government makes arguments that courts have repeatedly rejected in the family separation context. (See Opposition.)  In over fifteen instances, district courts have rejected the Government's arguments that FTCA exceptions, including the five raised in the Motion, apply in this context. (Id.)  The Government fails to persuade the Court to rule any differently.  Therefore, this Court joins in the growing chorus of courts that largely reject the application of FTCA exceptions to claims arising out of the Government's family separation policy.

Here, Plaintiffs explicitly identify United States officials and employees as tortfeasors and refer to specific employees by name or function whenever possible. (See Complaint.)  Identifying "every employee, official, and contractor involved in each of the alleged acts . . . is not required at this early stage of litigation when discovery has yet to be conducted."  A.F.P., 2022 WL 2704570, at *18; see also Wilbur P.G., 2022 WL 3024319, at *6 (finding plaintiffs' inability to "name the individual Border Patrol officers who forcibly separated them and detention center employees without the benefit of discovery" was not fatal to their action).  Accordingly, the Court DENIES the Government's Motion based on the impermissible institutional or systemic torts argument.

## B.  Discretionary Function Exception

The Government next argues that Plaintiffs' claims should be dismissed under the discretionary function exception because the "challenged decisions involved an element of judgment or choice and were susceptible to policy analysis." (Motion at 14.)  Plaintiffs counter that the Government fails to meet its burden under this exception because (1) Government officials have no discretion to violate the Constitution; and (2) Plaintiffs allege that Government officials violated mandatory, not discretionary duties. (Opposition at 9-13.)

The discretionary function exception precludes claims against the United States that are "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion was abused."  28 U.S.C. §2680(a).  First, the court must determine whether the challenged conduct involves an element of judgment or choice.  Berkovitz v. United States, 486 U.S. 531, 536 (1988).  Second, if the challenged conduct is discretionary, the court must determine whether the conduct "implements social, economic, or political policy considerations."  Gasho v. United States, 39 F.3d 1420, 1435 (9th Cir. 1994).  However, the discretionary function exception does not shield the Government from liability for unconstitutional conduct.  A.F.P., 2022 WL 2704570, at *12 (citing Nurse v. United States, 226 F.3d 996, 1002 n.3 (9th Cir. 2000) (reversing the dismissal of FTCA claims pursuant to the discretionary function exception where the plaintiff alleged a constitutional violation)); see also A.P.F., 492 F. Supp. 3d 989, 996 (D. Ariz. July 27, 2020) (holding that the discretionary function exception does not apply where plaintiffs in circumstances similar to those alleged here asserted constitutional violations related to their forced family separation).

The Ninth Circuit has held that the "substantive due process right to family integrity . . . is well established."  Rosenbaum v. Washoe County, 663 F.3d 1071, 1079 (9th Cir. 2011).  Courts have consistently held that forced family separation amounts to a constitutional violation which prevents the application of the discretionary-function exception on a motion to dismiss.  See, e.g., Fuentes-Ortega v. United States, 2022 WL 16924223, at *3 & n.1 (D. Ariz. Nov. 14, 2022 (listing cases); F.R., 2022 WL 2905040, at *5 (D. Ariz. July 22, 2022); Wilbur P.G., 2022 WL 3024319, at *5; B.A.D.J., 2022 WL 11631016, at *3; Nuñez Euceda, 2021 WL 4895748, at *3 (C.D. Cal. Apr. 27, 2021) (holding that "the discretionary function [exception] does not bar [p]laintiff's claims" because plaintiff "has plausibly alleged that the government's [family separation] Policy violated his constitutional rights"); A.F.P., 2022 WL 2704570, at *12 (citing A.P.F., 492 F. Supp. 3d at 996); C.M., 2020 WL1698191, at *4 (D. Ariz. Mar. 30, 2020) (finding that plaintiffs had "plausibly alleged that the Government's separation of their families violated their constitutional rights, which is not shielded by the discretionary function exception").  Courts have reasoned that forced family separation under the family separation policy "arbitrarily tears at the sacred bond between parent and child[,] . . . 'shocks the conscience' and violates Plaintiffs' constitutional right to family integrity."  Ms. L. v. U.S. Immigr. & Customs Enf't, 302 F. Supp. 3d 1149, 1167 (S.D. Cal. 2018) (citation omitted).  The Court agrees.

The Government argues that the discretionary-function exception still applies because Plaintiffs "do not allege the violation of any constitutional provision with the degree of specificity required by Gaubert" and because Plaintiffs do not allege the violation of a specific Constitutional right that was clearly established at the times relevant to their Complaint. (Motion at 19.)  The Court finds that these arguments fail.  First, Plaintiffs sufficiently allege grave deprivations of their constitutional rights during the months they were forcibly separated from one another, and the Court sees no need to again lay out the harrowing factual allegations included above.  (See Complaint.)  Second, the Ninth Circuit has rejected the Government's argument that the constitutional right must be "clearly established."  In Galvin, the court declined to apply the discretionary-function exception even though "the constitutional right

violated . . . was not clearly established." <u>Galvin</u>, 374 F. 3d at 756-58 (citing <u>Nurse</u>, 226 F.3d at 1002 & n.2); <u>see also</u> <u>Xi v. Haugen</u>, 68 F.4th 824, 829 (3d Cir. 2023) (holding that "the 'clearly established' threshold" — "applicable to qualified immunity analysis" — "is inapplicable to the discretionary function analysis").

The Court finds that Plaintiffs plausibly allege a constitutional violation, that their forced separation violated their substantive-due-process right to family integrity, and that this is a sufficient basis to reject the application of the discretionary function exception. Accordingly, the Court finds that Plaintiffs' claims cannot be dismissed on the basis of the discretionary function exception.

## C. Due-Care Exception

The Government next argues that Plaintiffs' claims are precluded by the due-care exception to the FTCA, which bars liability "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." (Motion at 21) 28 U.S.C. § 2680(a).

The due-care exception applies if (1) a statute or regulation "specifically pr[e]scribes a course of action for an officer to follow," and (2) "the officer exercised due care in following the dictates of that statute or regulation." <u>Welch v. United States</u>, 409 F.3d 646, 652 (4th Cir. 2005); <u>see A.F.P.</u>, 2022 WL 2704570, at *14 ("Courts in the Ninth Circuit apply the two-prong test established by the decision in <u>Welch</u> . . . in determining whether the due care exception applies.").

Plaintiffs argue that the Government fails to establish both prongs of the due-care test. (Opposition at 15.) The Court agrees. The Government makes a cursory argument that the due-care exception applies because of the statutory requirement mandating care of unaccompanied children: "the United States is required to transfer the custody of children to the care of ORR not later than 72 hours after determining that there is no parent available to provide care and physical custody". (<u>Id.</u> at 22-23) 8 U.S.C. § 1232(b)(3). The Court is persuaded by Plaintiffs' contention that Esteffany was not "unaccompanied" until the Government forcibly separated her from her father. (Opposition at 16) <u>see Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't</u>, 319 F. Supp. 3d 491, 495 n.2 (D.D.C. 2018) (children separated from parents "are not true unaccompanied minors within the meaning of the statute they were rendered unaccompanied by the unilateral and likely unconstitutional actions of defendants"). The Government fails to provide a statute or regulation prescribing a course of action that would require the detention of Marcos in a facility 2,000 miles away from Esteffany. The Government has made similarly unconvincing arguments in other family separation cases, which courts have systematically rejected. <u>See, e.g.</u>, <u>A.F.P.</u>, 2022 WL 2704570, at *15 (rejecting application of the due-care exception when Defendant cited "no statute or regulation that required the detention of [plaintiff 1] in a different detention facility from [plaintiff 2]); <u>A.P.F.</u>, 492 F. Supp. 3d, at 995 n.3 (rejecting the argument that Section 1232 § (b)(3) required separation of parent and child when parent was

"amenable to prosecution" and declining to apply due-care exception); <u>C.M.</u>, 2020 WL 1698191, at *3 & n.4; <u>Nuñez Euceda</u>, 2021 WL 4895748, at *4.

Furthermore, even if a statute or regulation did exist that would satisfy the first prong of the due-care test, the Government makes no argument to support the second prong, that due-care was exercised.  Here, Plaintiffs allege countless instances in which the Government acted without due-care.  (<u>See</u> Complaint ¶¶ 6-10; 58-110.)  The Court finds that Plaintiffs sufficiently allege that due care was not exercised in the separation and subsequent treatment of Marcos and Esteffany.  Accordingly, the Court DENIES the Government's Motion as to the due-care exception.

## D.  Private Person Analogue

The Government argues that Plaintiffs' claims should be dismissed because there is no private person analogue, a requirement under the FTCA.  (Motion at 23-24.)  The FTCA's waiver of sovereign immunity is limited to "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The statute authorizes tort recovery against the United States only "in the same manner and to the same extent as a private individual under like circumstances."  <u>Id.</u> § 2674.  Because "the federal government 'could never be exactly like a private actor,'" courts assessing whether a claim has a private-person analogue must "find the most reasonable analogy" from applicable state law.  <u>Dugard v. United States</u>, 835 F.3d 915, 919 (9th Cir. 2016) (citation omitted); <u>see also</u> <u>Westbay Steel, Inc. v. United States</u>, 970 F.2d 648, 650 (9th Cir. 1992) (requiring "a persuasive analogy with private conduct" (citation omitted)).

The Government's argument relies on the premise that "[b]ecause only the federal government has the authority to enforce federal criminal and immigration laws and make determinations concerning detention, there is no private person analogue that could support a claim under the FTCA."  (Motion at 24.)  As with each prior attempt to invoke an FTCA exception, numerous courts have rejected this argument by the Government in the family separation context.  <u>See, e.g.</u>, <u>B.Y.C.C. v. United States</u>, 2023 WL 5237147, at *7 (D. N.J. Aug. 15, 2023); <u>C.D.A.</u>, 2023 WL 2666064, at *16 (E.D. Penn. Mar. 28, 2023); <u>A.F.P.</u>, 2022 WL 2704570, at *10 (holding that "[a] private person may be subject to liability under Texas law for IIED, abuse of process, and negligence in analogous circumstances" to family separation); <u>C.M. v. United States</u>, 2023 WL 3261612, at *20 (W.D. Tex. May 4, 2023) (finding private-person analogue for family-separation allegations in "tort cause of action" under Texas law "for interruption of the parent-child relationship when someone abducts, entices away, or harbors a parent's minor child"); <u>D.A. v. United States</u>, 2023 WL 2619167, at *10 (W.D. Tex. Mar. 23, 2023) (same).

Plaintiffs remind the Court that they "have not challenged Defendant's law-enforcement authority, but rather its tortious conduct in separating Plaintiffs and its treatment of them during that ten-week separation."  (Opposition at 18.)  In its Motion, the Government only cites to cases that have different claims and factual backgrounds than those in the instant case.  (Opposition at

19.)  Plaintiffs argue that "cases involving allegations that government officials negligently adjudicated applications for immigration status are irrelevant to Plaintiffs' allegations that Defendant's employees intentionally and negligently inflicted emotional distress and negligently caused physical, emotional, and economic injury by separating father and daughter." (Opposition at 19.)  The Court agrees.

Here, Plaintiffs bring claims of IIED, NIED, abuse of process and negligence.  (See Complaint.)  The applicable law in an FTCA action is the law of the state where the alleged tortious act or omission occurred.  See 28 U.S.C. § 1346 (b).  Courts use the choice-of-law provisions from that state to determine what substantive law applies.  See Richards v. United States, 369 U.S. 1, 8-10 (1962).  Here, the allegedly tortious acts or omissions that form the basis of Plaintiffs' complaint occurred in Texas.  (See Complaint.)  Therefore, the Court applies Texas's choice of law rules.  Because Texas courts look to the state with the most significant relationship in their choice-of-law analysis, the tort law of Texas applies to Plaintiffs' claims.  See Quicksilver Res. Inc. v. Eagle Drilling, LLC, 792 F. Supp. 2d 948, 951 (S.D. Tex. 2011) (citing Gutierrez v. Collins, 583 S.W.2d 312, 318 (Tex. 1979)); see A.F.P., 2022 WL 2704570, at *10 (applying Texas law to analyze claims of IIED, abuse of process, and negligence and find adequate private person analogues).  The Court analyzes Plaintiffs' claims under Texas law.

### 1.  IIED

To state a claim for IIED under Texas law, Plaintiffs must show "(1) the defendant acted intentionally or recklessly, (2) the conduct was extreme and outrageous, (3) the actions of the defendant caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe."  D.A., 2023 WL 2619167, at *16 (quoting Twyman v. Twyman, 855 S.W.2d 619, 620 (Tex. 1993)).  Additionally, multiple courts have held that allegations of family separation satisfy the requirements for IIED under Texas law.  See, e.g., C.M., 2023 WL 3261612, at *47 (plaintiffs plausibly stated IIED claim where they alleged "that they were housed in a cold environment without adequate clothing or protection, subjected to verbal and physical abuse, fed lies about what would happen during their separation, and separated without contact"); D.A., 2023 WL 2619167, at *16 (IIED claim plausible where plaintiff alleged "federal agents took her children away on short notice without giving her an opportunity to say goodbye, did not tell her where her children had been taken, and did not allow Plaintiffs to communicate for several weeks"); C.D.A., 2023 WL 2666064, at *22 (holding on similar allegations that "a reasonable mind could find the Government's alleged conduct 'so outrageous in character or extreme in degree as to go beyond the bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community'" (quoting Elliott v. Methodist Hosp., 54 S.W.3d 789, 796 (Tex. App. 2001)).

In their Complaint, Plaintiffs allege that Government employees had legal obligations to Plaintiffs as persons in their custody, giving rise to a special relationship and subsequent duty of care owed toward Plaintiffs.  (Complaint ¶ 112.)  Plaintiffs allege that the Government's forced separation of Marcos and Esteffany, its failure to inform Plaintiffs about the others' whereabouts, and its subjecting Marcos and Esteffany to substandard conditions of custody, constitutes the

Government's breach of its duty of care and violation of various federal standards and the Constitution.  (Id. ¶ 113.)  Based on this, Plaintiffs allege that Government employees, officials, officers, and agents maliciously engaged in extreme and outrageous conduct with an intent to cause, or with at least a reckless disregard of the likelihood of causing, Plaintiffs to suffer severe emotional distress.  (Id. ¶ 114.)  Plaintiffs allege that as a direct and proximate result of the Government's conduct, they suffered severe emotional distress throughout their time in Government custody and continue to suffer the lasting effects of that distress today.  (Id. ¶ 115.) Based on these allegations and the numerous more specific examples throughout Plaintiffs' Complaint, the Court finds that Plaintiffs sufficiently plead an IIED claim and that it has a private person analogue in Texas law.

### 2.  NIED

The Government argues that Plaintiffs' NIED claim must be dismissed because "there is no general duty in Texas not to negligently inflict emotional distress."  (Motion at 30) Boyles v. Kerr, 855 S.W.2d 593, 594 (Tex. 1993.)  Plaintiffs do not contest the Government's argument as to their NIED claim.  (Opposition at 27, n.12.)  The Court has not identified any cases in the family separation context in which a court applying Texas law has allowed an NIED claim to proceed past the motion to dismiss phase.  See B.Y.C.C., 2023 WL 5237147 (finding that Plaintiffs' NIED claim could not proceed under Texas law); see also C.D.A., 2023 WL 2666064, at *23 (dismissing NIED claim under Texas law because such a claim is not recognized in Texas). Accordingly, the Court GRANTS the Government's Motion as to Plaintiffs' NIED claim (Count Two).

### 3.  Abuse of Process

Texas law provides for an abuse of process claim where a private person, as well as a government employee, engages in "the malicious use or misapplication of process in order to accomplish an ulterior purpose."  Hunt v. Baldwin, 68 S.W.3d 117, 129 (Tex. App. 2001) (defining abuse of process in an action brought by debtor against creditors, a lawyer, and law firms); see also Cooper v. Trent, 551 S.W.3d 325, 333-34 (Tex. App. 2018) (concluding that an abuse of process claim based on allegations of prosecutor's pre-trial misconduct could proceed); Peerless Oil & Gas Co. v. Teas, 138 S.W.2d 637, 641 (Tex. Civ. App. 1940).  The A.F.P. court applied this standard in the family separation context.  A.F.P., 2022 WL 2704570, at *10 (finding that plaintiffs alleged that defendant maliciously used plaintiff's prosecution for illegal entry as a pretext for separating him from his minor son in pursuit of an ulterior purpose of deterring other asylum seekers from entering the United States).  Here, Plaintiffs allege similar facts as plaintiffs in A.F.P.  (Complaint ¶¶ 38; 123-27.)  Therefore, the Court finds that Plaintiffs have sufficiently alleged an abuse of process claim under Texas law and satisfied the private person analogue.

### 4.  Negligence

Finally, the Government's challenge of Plaintiffs' negligence claim fails.  Under Texas law, a plaintiff bringing a negligence claim must show: (1) a legal duty; (2) a breach of that duty;

and (3) damage proximately caused by the breach.  <u>Gann v. Anheuser-Busch, Inc.</u>, 394 S.W.3d 83, 88 (Tex. App. 2012).

Texas courts have previously held that a negligence claim may be pursued against private individuals tasked with the custody of others.  <u>A.F.P.</u>, 2022 WL 2704570, at *10 (citing <u>Salazar v. Collins</u>, 255 S.W.3d 191, 198 (Tex. App. 2008).  Texas courts recognize the kind of ailments alleged by Plaintiffs as sufficient grounds to support damages for negligence.  <u>See HCRA of Tex., Inc. v. Johnston</u>, 178 S.W.3d 861, 870 (Tex. App. 2005) (upholding jury award of damages for dehydration and malnutrition caused by nursing home's negligence).

The Government contends that Plaintiffs' negligence claim should be dismissed for failure to identify an applicable duty under Texas law.  (Motion at 32.)  This argument ignores the five duties that Plaintiffs allege in their complaint: (1) the <u>Flores</u> settlement agreement standards for the treatment of minors, including food, drink, hygiene, sanitation, temperature, supervision, safety, medical assistance, contact with family members, and respect and special concern for their particular vulnerability as minors; (2) ORR's obligation to place a child in the least restrictive setting that is in the best interests of the child; (3) CBP's TEDS standards governing food, drink, hygiene, bedding, temperature, documentation, and respect for family unity; (4) ICE's PBNDS, requiring humane conditions when detaining migrants; and (5) the fundamental right to family integrity under the U.S. constitution, including, but not limited to, Plaintiffs' rights to due process under the Fourteenth Amendment.  (Complaint ¶¶ 113; <u>see also</u> <u>id.</u> ¶¶ 26-36; <u>id.</u> ¶¶ 129-30.

In the context of family separation and more broadly, these allegations are sufficient to establish the duty element of a negligence claim.  <u>See</u> <u>C.M.</u>, 2023 WL 3261612, at *5-8, 47 (discussing many of these standards as background and holding that plaintiffs had plausibly pleaded a negligence claim "grounded in a breach of the duty owed by federal agents to persons in their care"); <u>Browning v. Graves</u>, 152 S.W.2d 515, 518 (Tex. Civ. App. 1941) (recognizing that a sheriff and her deputies owe inmates a reasonable duty of protection from foreseeable harm); <u>see also</u> <u>Salazar v. Collins</u>, 255 S.W.3d 191, 200 (Tex. App. 2008) (reexamining <u>Browning</u> and finding it consistent with "a significant majority of courts in other states [that] have likewise concluded that prison or jail officials owe a duty of reasonable care to protect inmates from harm when that harm is reasonably foreseeable"); <u>Nuñez Euceda</u>, 2021 WL 4895748, at *4 ("Courts in this Circuit also recognize negligence claims brought under the FTCA where, as here, a prisoner alleges an agent negligently placed him in a certain cell"); <u>C.M.</u>, 2020 WL 1698191, at *2 (relying on the same analogy).

The Government also argues that Marcos fails to allege that he suffered any physical harm and therefore Plaintiffs' negligence claim should be dismissed.  (Motion at 31-32.)  Texas allows "mental anguish damages" for negligence-based claims where (1) "they are the foreseeable result of a breach of duty arising from some special relationship," or (2) they involve "injuries of such a shocking and disturbing nature that mental anguish is a highly foreseeable result."  <u>B.Y.C.C.</u>, 2023 WL 5237147, at *13 (finding that Plaintiffs sufficiently pleaded a negligence claim in the family separation context) (citing <u>Fitzpatrick v. Copeland</u>, 80 S.W.3d 297,

303 (Tex. App. 2002)); see also C.M., 2023 WL 3261612, at *47.  The Court finds that Plaintiffs' allegations meet this standard.  (See Complaint.)

The Court finds that Plaintiffs sufficiently plead the elements required for a negligence claim under Texas law.  Accordingly, the Court finds that Plaintiffs' claims for IIED, abuse of process and negligence all have private person analogues and as such, DENIES the Government's Motion as to Plaintiffs' IIED, abuse of process and negligence claims under the FTCA private person analogue.  As noted above, the Court GRANTS the Government's Motion as to Plaintiffs' NIED claim.

## E.  Independent Contractor Exception

The Government argues that Plaintiffs' allegations that Esteffany was not provided adequate and timely medical care and that she endured neglect while in foster care are barred by the FTCA's independent contractor exception.  (Motion at 24-25.)

The FTCA waives sovereign immunity for tortious conduct of an "employee of the Government," and it expressly "excludes 'any contractor with the United States.'"  28 U.S.C. § 2671.  However, this exception does not shield the United States from liability "any time it hires an independent contractor."  Edison v. United States, 822 F.3d 510, 517 (9th Cir. 2016) (finding that the independent contractor exception was not applicable because the government owed a duty of care to Plaintiffs).  The Government may still be liable for an independent contractor's tortious conduct if it "control[s] the physical conduct of the contractor in performance of the contract."  B.Y.C.C. v. United States, 2023 WL 5237147 (D. New Jersey 2023) (finding this fact-based inquiry is not appropriate at the motion to dismiss stage and declining the Government's independent contractor exception argument) (citing Logue v. United States, 412 U.S. 521, 527 (1973)).

Plaintiffs allege that Esteffany received inadequate medical care and suffered severe emotional and physical distress while in ORR custody as a direct result of her separation from her father—conduct that was committed not by independent contractors, but by government employees.  (Opposition at 20.)  While under United States custody, Esteffany was flown more than 2,000 miles to New York City.  (Complaint ¶ 84.)  Upon her arrival in New York, federal employees transferred her into the custody of HHS and the care of Cayuga Centers, an organization that places children in foster homes.  (Id.)  Many, but not all, of Plaintiffs' allegations of neglect stem from the time when Esteffany was assigned to live with a woman in her apartment in New York City.  (Id. ¶¶ 86-92.)

The Court finds that whether government employees, independent contractors, or both were responsible for the alleged neglect of Esteffany is a question of causation that cannot be decided on a motion to dismiss.  In doing so, the Court agrees with the courts that have declined the independent contractor exception in the family separation context.  See, e.g., A.P.F., 492 F. Supp. 3d, at 998 ("To the extent the United States argues that the contractors caused Plaintiffs' harm, and not the government, this raises a fact-intensive issue inappropriate for resolution at

this stage."); <u>A.F.P.</u>, 2022 WL 2704570, at *18 (declining to dismiss claim based on independent-contractor exception where plaintiff alleged "that the government's conduct of forcibly separating plaintiffs was a direct and proximate cause of the harm suffered by plaintiff" while in a contractor-run facility for separated children); <u>B.Y.C.C.</u>, 2023 WL 5237147, at *9 (considering the fact that Plaintiffs plead a number of tortious acts that both preceded and occurred after the minor Plaintiffs' placements at ORR-contracted facilities). Accordingly, the Court finds that at this stage, there is insufficient basis for a dismissal under the independent contractor exception and DENIES the Government's Motion on this basis.

In sum, with the exception of Plaintiffs' NIED claim, the Court finds each of the FTCA exceptions raised in the Government's Motion either inapplicable or lacking in factual support. As such, the Court DENIES the Government's Motion as to Plaintiffs' IIED, abuse of process, and negligence claims. The Court GRANTS the Government's Motion as to Plaintiffs' NIED claim. The Court next turns to the Government's Rule 12(b)(6) arguments regarding Plaintiffs' alleged failure to state a claim.

**F.  12(b)(6)**

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." <u>Id.</u> at 570; <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." <u>Starr v. Baca</u>, 652 F.3d 1202, 1216 (9th Cir. 2011).

The Court rejects the Government's argument that its actions are protected by state law privileges. (<u>See</u> Motion at 28.) In the Fifth Circuit, "[a]ctions that may otherwise subject a defendant to liability are not tortious if the conduct is privileged." (Motion at 28) <u>Villafranca v. United States</u>, 587 F.3d 257, 264 (5th Cir. 2009) (holding that law-enforcement agents could invoke Texas's civil-privilege defense codified at Tex. Penal Code § 9.51(a), in an FTCA case). The Government alleges that "Border Patrol and ICE agents engaged in privileged conduct while enforcing existing federal criminal and immigration statutory authorities" but fails to cite to any federal statutory authority to support this argument. (<u>Id.</u>) Instead, the Government relies on various cases in which courts, unlike here, applied an expressly identified privilege with an articulable relevance to the conduct at issue. (<u>See</u> Opposition at 21-22.) Again, courts ruling in the family separation context have rejected the Government's argument. <u>See, e.g.</u>, <u>C.M.</u>, 2023 WL 3261612, at *45 (rejecting privilege argument because "[t]he Government has presented no state law privilege regarding the separation-based claims Plaintiffs pursue in this case"); <u>C.D.A.</u>, 2023 WL 2666064, at *22 (rejecting identical privilege argument in family-separation case

because "the Government cites no privileges relevant to [plaintiffs'] claims" and "the claims they *do* raise do not appear to contain elements that would grant comparable privileges to the Government employees whose conduct is in question in this case").

The Government argues that Plaintiffs' claims are not cognizable under Texas law: (1) IIED; (2) NIED; (3) abuse of process; (4) negligence. (Motion at 29-33.) To prove jurisdiction under the FTCA, Plaintiffs had to prove the existence of a private analogue under state law. This required Plaintiffs to demonstrate that "a private individual under like circumstances would be liable under state law." A.P.F., 492 F. Supp. 3d, at *999 (citing U.S. v. Muniz, 374 U.S. 150, 153 (1963); 28 U.S.C. § 1346(b)). Because the Court has already determined that Plaintiffs demonstrated a private analogue for Plaintiffs' claims of IIED, abuse of process and negligence, for the same reasons, the Court concludes that Plaintiffs have demonstrated that their claims of IIED, abuse of process, and negligence are cognizable under Texas law. Given that the court does not have subject matter jurisdiction over Plaintiffs' NIED claim because Texas does not have a private person analogue, the Court does not analyze this claim under a 12(b)(6) standard.

## V.    CONCLUSION

For the reasons above, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the Government's Motion. Only Plaintiffs' NIED claim (Count Two) is **DISMISSED WITH PREJUDICE**. The September 25, 2023 hearing is **VACATED**.

**IT IS SO ORDERED.**